LYNNE H. STEARNS, RESPONDENT, v. THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, A CORPORATION, APPELLANT.—140 S. W. (2d) 766.

Springfield Court of Appeals.   May 21, 1940.

Rehearing Denied, June 6, 1940.

136

*Fordyce, White, Mayne, Williams & Hartman* and *Oliver & Oliver* for appellant; *Ralph W. Hyatt* of counsel.

*Tedrick & Tedrick* for respondent.

TATLOW, P. J.—I. This is a suit on a health insurance policy. The policy provides:

"If the Insured shall become totally and permanently disabled, either physically or mentally, from any cause whatsoever, to such an extent that he (or she) is rendered wholly, continuously and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value during the remainder of his (or her) lifetime, and if such disability shall occur at any time after the payment of the first premium on this Policy, while this Policy is in full force and effect and the Insured is less than sixty years of age, and before any non-forfeiture provision shall become operative, the Company, upon receipt of due proof of such disability, will grant the following benefits:

"(1) *Waiver of Premiums.*—The Company will waive the payment of any premium or premiums the due date of which, as specified on the first page hereof shall occur after receipt by the Company of said proof of such disability.

"(2) *Monthly Income to the Insured.*—The Company will, in addition to waiving premiums, pay to the Insured the Monthly Income specified on the first page hereof under the heading 'Total and Permanent Disability Benefits.' The first monthly payment shall be made immediately upon receipt by the Company of due proof of such disability and subsequent payments shall be made on the first day of each month thereafter. . . ."

The policy contains, in addition thereto, a rider to the effect that, should the permanent disability continue for a period of ninety consecutive days, it should be presumed to be permanent.

The petition alleged, among other things:

". . . that on the 16th day of August, 1930, and while said policy was in full force and effect and before plaintiff had attained the age of 60 years, he became and is now totally and permanently disabled within the meaning of the terms of the policy issued to him on the date, as aforesaid, as a result of the following physical ailments: chronic pleurisy, chronic bronchitis, chronic bronchiectasis and active pulmonary tuberculosis; that immediately thereafter he furnished due proof of said total and permanent disability to the defendant and thereupon defendant commenced paying him the sum of one hundred ($100.00) dollars per month as provided for in said insurance policy, and paid said sum monthly from the 16th day of August, 1930, until the 16th day of April, 1932, at which time defendant ceased making the aforesaid payments.

"Plaintiff further states that at the time said payments were stopped, as aforesaid, he was still totally and permanently disabled and was entitled to the continuation of said payment of one hundred ($100.00) dollars per month, but plaintiff states that the defendant, wholly disregarding the terms and conditions contained in said policy, refused to pay him said amount or any part thereof and he was finally compelled to and did, on the 4th day of September, 1935, institute

an action in the Circuit Court of Butler County, Missouri, against the defendant, to enforce the resumption of the aforesaid payments; but plaintiff states that before said cause came to trial, to-wit, on November 10, 1935, he was, at the request of the defendant, examined by the defendant's examining physician and that after said examination the defendant resumed the payment of his disability benefits of one hundred ($100.00) dollars per month, and continued to pay same up to and including the payment due on the 14th day of December, 1938.

"Plaintiff further states that on January 6, 1939, the defendant again suspended his payments of his disability benefits, as aforesaid, and notified him that he would be required to resume the payment of the premiums on said policy which defendant expressly agreed to waive in case of plaintiff's total and permanent disability.

"Plaintiff states that on August 10, 1939, he again submitted proof of his total and permanent disability to the defendant and on the same date demanded payment of the benefits then due him, being the aggregate of the monthly payments due on the 14th of each of the following months, viz.: May, June, July and August, 1939, which plaintiff states amounts to four hundred ($400.00) dollars, and on said date he also demanded the refund of a quarterly premium of thirty-nine and 40/100 ($39.40) dollars paid by him to the defendant on May 24, 1939.

"Plaintiff further says that on the 24th day of August, 1939, he paid to the defendant another quarterly premium of thirty-nine and 40/100 ($39.40) dollars, making a total of seventy-eight and 80/100 ($78.80) dollars in premiums paid to defendant which under the terms and conditions of said policy should have been waived by said defendant."

The defendant's answer first makes a general denial and then continues:

". . . and without waiving its general denial hereinabove pleaded defendant denies that plaintiff was totally and permanently disabled under the terms of the policy sued upon, as alleged in plaintiff's petition, and denies that plaintiff is now totally and permanently disabled so as to prevent him from engaging in any gainful occupation.

"Defendant, further answering the petition of plaintiff, states that prior to the filing of his petition plaintiff failed to make due proof to the home office of defendant in accordance with the terms and conditions of the policy of insurance sued upon to the effect that plaintiff became totally and permanently disabled so as to be unable to engage in any gainful occupation; and defendant denies that there was any such proof so submitted by or on behalf of plaintiff sufficient in form and/or contents to comply with the requirements, terms and provisions of said policy."

The verdict of the jury is as follows:

"We, the jury, find the issues for the plaintiff and assess his damages as follows: the sum of $400 for monthly payments due; the sum of $40 for vexatious refusal to pay; the sum of $100 as attorney fees, and the sum of $78 for the premiums paid by plaintiff to the defendant."

Judgment was rendered in accordance with the verdict and proper steps were thereafter taken by which the case was appealed to this court.

## II.

Numerous assignments of error have been made. Appellant's first assignment of error is that the trial court should have directed a verdict for it for the reason that, while the respondent offered evidence tending to support his claim of being totally and permanently disabled at the time of the trial, he offered no evidence to show what proof was submitted to the defendant as a basis for his claim at any time, either in 1930, 1932, 1935 or 1939, and cites in support thereof Jacoby v. N. Y. Life Ins. Co., 77 S. W. (2d) 840; Adams v. Metropolitan Life Ins. Co., 74 S. W. (2d) 899; Bergholm v. Peoria Life Ins. Co., 284 U. S. 489, 52 S. Ct. 230, 76 L. Ed. 416; and Feinberg v. N. Y. Life Ins. Co., 127 S. W. (2d) 82.

These cases, of course, hold that it is necessary for the insured to make the required proof or show a waiver thereof. Appellant chiefly relies on the Jacoby case *supra*, and there is a superficial analogy between it and the instant case. In that case, as in the instant case, the insured was furnished blanks by the insurance company and filled out and returned the blanks. The evidence did not show what was contained in the blanks, as in the instant case. Concerning this, the court there said:

". . . All that appears in the record concerning the contents of such paper is the statement of the defendant in its letter that, from the evidence submitted and the information obtained, neither plaintiff's total disability nor proof thereof appeared upon plaintiff's part to establish his right to benefits under the policy; and later it advised him that it would consider any evidence of 'total disability' he desired to furnish. From these two letters, it sufficiently appears that defendant did not deny liability, but only refused to approve the claim and acknowledge liability upon the evidence furnished and the information obtained because they did not show total disability upon plaintiff's part and advised plaintiff that, if he would submit to it such evidence of 'total disability,' it would further consider it." [77 S. W. (2d) l. c. 844, 845.]

The perfectly apparent distinction between that case and the instant case is that there the company considered the proof submitted to be *insufficient* and so notified the insured. It then devolved upon the

insured to either submit additional and sufficient proof, or to affirmatively show that the proof submitted was sufficient. The insured did neither, but claimed that the company had waived the necessity of such proof by denying liability, and the court correctly held that the company had not denied liability but wanted more information as to his condition.

In the instant case the company not only did not notify the insured that the proof was *insufficient*, but accepted it, acted upon it and actually made payments based on it, which payments extended over a period of a number of years; all of which is affirmatively pleaded and clearly shown by the evidence in the case.

In the Feinberg case, *supra*, it is said:

". . . an insurance company, upon receipt of notice of disability, is under a duty to advise the insured as to information or proof that it requires as to his claimed disability, and that if it fails so to do within a reasonable time it cannot, by virtue of such failure, escape its obligation to waive premiums and pay disability benefits on the ground that the insured has failed to furnish 'due proof.' ". [127 S. W. (2d) 1. c. 92.]

The recent case of Wollenberg v. Equitable Life Assurance Society, 96 S. W. (2d) 57, 1. c. 59, is directly in point that, on this record, the appellant cannot escape liability on the ground that the respondent failed to make proper proof of disability. Especially is this so because appellant brought out on the cross examination of O. A. Tedrick that he, as respondent's attorney, had instituted five suits for the respondent against the Prudential Insurance Company for collection of total and permanent disability benefits. He further testified:

"The first lawsuit was settled for $2500. That was my entrance in the case. But as to what he received before that I don't know that. They started paying him again in January, 1936. Then, I think, they paid him for three years at a hundred dollars a month. That would be $3600. Then one of these cases has been paid, which was for $100; one of the Justice Court cases. Now, to my knowledge, that is what he has received since I have been representing him, but as to what he received before that I couldn't say. Since I have been attorney for him, he has been paid $6200 on this policy. I don't know how much they paid him before my entrance into the case. As I recall, the suit that I filed for payment was for a period of time beginning in August, 1932. Since I have been in the case I know of his having received $6200. This suit is to collect $400 more."

The respondent's testimony was that the onset of the disability was in June, 1930. The last day he worked was August 16, 1930. Dr. Helm made the first examination; after such examination the company started paying respondent, but, on the examination of Dr. Kneibert, discontinued paying him in April, 1932. Respondent started paying regular premiums, and, in 1938, filed suit, which suit was com-

promised. Respondent testified that he had not engaged in any work since 1930, except that on the afternoon of August 6, 1939, he worked as a filling station attendant from one o'clock until five o'clock. He was entirely exhausted afterwards and his heart raced at great length from Friday afternoon through all day Saturday, and he was in bed from Friday, October 6th, through and until the next Friday. He had a severe cough and ran a high temperature. Dr. Lester Harwell was in attendance. Respondent testified that when he attempted to work around the yard, raking leaves and things of that kind it had the same effect on him, in a minor way, as the work he had done at the filling station. The doctor advised him not to exert himself in any way.

There were three physicians who testified for respondent.

Dr. McCauley, who examined him in 1935 and also on January 27, 1939, did not think he found any myocarditis in 1935 but found that he was suffering at that time from bronchitis. He was unable, in 1935, to make a positive diagnosis of tuberculosis, though there was some evidence to support such a diagnosis.

Dr. Lee Harwell examined respondent on January 27, 1939, and found him suffering from active tuberculosis.

Dr. J. Lester Harwell had been treating respondent since September, 1935, up to the date of the trial. He treated him chiefly for tuberculosis and myocarditis. He examined him on January 27, 1939, and found him suffering also from chronic bronchiectasis. Myocarditis greatly impairs a person's ability to move and get around and slows them down very much. It is an affliction of the heart. Dr. Harwell expressed the opinion that plaintiff had been suffering from myocarditis probably two or three years and from bronchiectasis for about the same length of time.

Dr. Louis Aitken, who testified for the appellant, made his first examination of respondent in 1935 and his second and last examination in 1938.

While none of the physicians who testified in the case examined respondent prior to 1935, it does appear from respondent's testimony that he was examined by two other physicians prior to that time, upon which examinations the appellant made payments and subsequently compromised the first suit and began making monthly payments of $100 in 1936, and continued to make such payments for three years.

Respondent's testimony shows that his condition has been the same since 1930, and the evidence was clearly sufficient to justify the court in submitting to the jury the question as to whether he had made satisfactory proof to the company of his permanent and total disability after August 16, 1930, and before the filing of this suit, upon which the company acted, as aforesaid, so that the court did not err in submitting such question to the jury.

## III.

The appellant assigns as error that the court erred in permitting the physician witnesses offered by plaintiff to "testify as to the ultimate facts, to-wit, that the plaintiff was totally and permanently disabled," which invaded the province of the jury.

Concerning this assignment we quote from the testimony of Dr. B. J. McCauley, shown in the record, the following:

"Q. Now, doctor, taking into consideration the physical condition that you found the plaintiff in on January 27, or whatever date this was, in 1939, state whether, in your opinion, the plaintiff would be able to perform any work, either mental or physical, that would require any exertion without its being dangerous to his health.

"Mr. Oliver: We object to that, because this witness has made no examination as to the condition of the plaintiff and the plaintiff's health during the months sued for here, May, June, July and August, and we object to it.

"The Court: You are asking for his condition in January.

"Mr. L. E. Tedrick: Yes, we can establish that.

"The Court: Overruled.

"Mr. Oliver: Exception.

"A. Well, I found him on that date, in my opinion, to be totally and permanently disabled and incapable of engaging in any physical exercise of any kind.

Mr. Oliver: Object to that and ask that the answer be stricken for the reason it invades the province of the jury and is not responsive to the question and is wholly a conclusion and the opinion of the witness and does not cover the time sued for in this lawsuit."

The physician had testified somewhat in detail as to the condition he found upon his examination of the insured. The other two physicians who testified for plaintiff, one of whom has examined him and the other treated him for several years, expressed like opinions.

Dr. J. Lee Harwell testified that at the time he examined the insured, on January 27, 1939, he found him suffering from bronchitis, bronchiectasis, myocarditis, pleurisy—he believed chronic pleurisy—and was sure of pulmonary tuberculosis. He stated that, in his opinion, insured's ailments were permanent and total disability was caused therefrom. There is no objection or exception shown to this opinion.

On the cross examination of this witness there appears among other things, the following:

". . . I don't think it would be safe for Mr. Stearns to call upon the grocery stores here in Poplar Bluff one or two days a week for orders, because all of the times I saw him he had temperature. He had a positive T. B. test. And a person who has tuberculosis, running a temperature, really should be in bed. I do not know that he has these temperatures—nothing only the history he gave. I have not treated him at all. He should not call at the stores and take orders if

he has tuberculosis until he hasn't run a temperature for quite a long time.

. . . . . .

"I am familiar with the fact that a good deal of salesmanship is carried on today by telephone, and there is no reason why he couldn't carry on such work by telephone if he could get the work to do. He couldn't conduct—the mental strain of those things is almost as bad as the physical. He might assist somebody else. He could act as an assistant if he could help somebody else and could get into the business and would stay at home. It is a fact that in some cases, rather frequently, people get the idea they are sick and it does affect sooner or later their physical condition, but it doesn't give them tuberculosis.

"Q. If a man hasn't done any work, or tried to do any work, from 1930 up until half a day on the 6th day of October, 1939, that's a long time between tries, isn't it, doctor? A. Yes."

Dr. J. Lester Harwell testified as follows:

"I know plaintiff, Lynne H. Stearns, and have been treating him since September, 1935, up to the present time; treating him chiefly for tuberculosis and myocarditis. I made an examination of him in connection with Dr. McCauley and my father on January 27, 1939, and found him suffering from chornic bronchiectasis, chronic bronchitis and pulmonary tuberculosis and chronic pleurisy. By chronic I mean of long standing or duration. I first started treating him in 1935. In 1935 I thought he was suffering from tuberculosis, but was not sure of it; he had bronchitis at that time and has had it continuously since that date up to the present date of my examination and report here, January 27, 1939. It was about a year or a year and a half ago that I definitely reached the opinion that he had tuberculosis. Then I, with my father and Dr. McCauley, confirmed that fact by our examination of January 27, this year.

. . . . . .

"Q. Doctor, taking into consideration your experience with this plaintiff in treating him, and also taking into consideration the ailments, if any, you found him to be suffering with on January 27, 1939, and any previous dates, state whether, in your opinion, the condition that you found, his disability, if any, is permanent or otherwise. A. In my opinion, he is permanently disabled.

"Q. What would you say with reference as to whether or not these ailments would totally disable him from working? A. I think they would totally disable him from working.

"Mr. Oliver: Wait a minute. We object to those questions and answers and move that they be stricken. We are objecting to it on the ground it invades the province of the jury, and we ask the answers be stricken.

"The Court: Overruled."

The witness also testified that respondent's condition, in August, 1939, when he made his last examination, was getting worse. "The myocarditis is very much aggravated."

The appellant called Dr. Louis F. Aitken, whose profession is "a diagnostician-internist," which he defined as follows:

". . . An internist is a man by history, physical examination and specialized types of laboratory examination arrives at an accurate diagnosis and deduces from such data as to what the course of treatment should be."

He testified at some length that, on his examination, he did not find that the insured had any of the diseases which the other doctors testified that he had. His testimony concludes as follows:

"Q. Now, doctor, from the examination which you made of Mr. Stearns, you may tell the jury whether or not, in your opinion as a physician, from the examinations which you have made of him, whether in your opinion it would be detrimental to his health to do some such work as he did do early in life, as a salesman or work of that type? A. Well, after studying Mrs. Stearns' case rather thoroughly, it is my honest opinion that this man would actually regain his full vigor of health if he would become occupied in some line of work, but now he has what we term a chronic invalid reaction, which is purely mental, and the sooner he gets his mind off himself and applies himself to some gainful occupation that he will enjoy much better health than he does now."

Observe that the difference between the doctors is that, in the opinion of those testifying for the respondent or the insured, he actually had the diseases pleaded in the petition, and, in the opinion of the expert testifying for the company "now he has what we term a chronic invalid reaction, which is purely mental, and the sooner he gets his mind off himself and applies himself to some gainful occupation that he will enjoy much better health than he does now." In other words, in the opinion of the appellant's expert, respondent is a hypochondriac. It will be observed that he does not testify that such a condition is not permanent; on the contrary, the only inference that can be drawn from his testimony is that, unless respondent can be induced to change his mental attitude with reference to his condition, it is just as permanent as if he actually had the diseases which the other physicians testify that he does have.

From a practical standpoint, so far as the condition of the insured is concerned, it would seem to be the difference between Tweedledum and Tweedledee. No matter which theory is correct the fact still remains that the only question is whether the insured was, by reason of such condition, whether physical or mental, rendered permanently unable to engage in any occupation or perform any kind of work for any kind of compensation of financial value. If so, he is within the terms of the policy entitling him to compensation.

In support of its contention that permitting physicians to testify to ultimate facts invades the province of the jury appellant cites U. S. v. Spaulding, 293 U. S. 498, 79 L. Ed. 617, 1. c. 623; Corcoran v. Metropolitan, 93 S. W. (2d) 1027; Roscoe v. Ry. Co., 202 Mo. 576, 1. c. 594-6; Fields v. Luck, 44 S. W. (2d) 18. These cases announce the elementary rule that a witness, even though an expert, should not be permitted to substitute himself for the jury.

The sole and only question in the instant case was whether the respondent was totally and permanently disabled from engaging in any gainful occupation or business. At one time the questions and answers would have constituted reversible error. This is no longer true. O'Leary v. Scullin Steel Company (en banc), 303 Mo. 363, par. III, pp. 375-382, in which case it is clearly and directly held that, where the sole question was whether "the boil or the injury to the thumb was the cause of the infection of the ulna" (which is the exact equivalent of the question in the instant case—whether the respondent was totally and permanently disabled) it was competent for an expert to express an opinion thereon, even though it was the ultimate fact to be decided. The question is very exhaustively considered in the case *supra* and it would be supererogation on our part to attempt to further discuss it. Paragraph III, *supra*, upon its face, purports to be the individual opinion of the learned judge rendering it, but it will be observed that all of the judges concurred in the opinion as a whole, except Judge Woodson, who dissented as to paragraph III.

In the case of Busch & Latta Painting Co. v. Woermann Construction Co., 310 Mo. 419, 1. c. 442, it is held that paragraph III of the O'Leary case is the opinion of the Supreme Court, en banc, and overrules previous cases to the contrary. Hence, it is apparent that the question is no longer an open one in this State, and certainly not in this court, and the point is ruled against the appellant.

### IV.

Appellant alleges numerous technical errors, such as that respondent should not have been permitted to try the case because the policy sued on was not attached to the petition, as required by section 815, Revised Statutes 1929. It sought to raise this question by objecting to the trial after the jury was sworn and evidence offered.

It is perfectly apparent that such objection could only be raised by a motion to dismiss or to require the filing of the policy. [Hannibal, etc., R. R. Co. v. Knudson, 62 Mo. 569.] When the objection was made the policy was produced and filed, which complied with the statute.

The further point is made that, when appellant objected to respondent referring in his testimony to the fact that several previous suits had been compromised, the court sustained the objection and instructed the jury to disregard the testimony but refused to discharge

the jury. The court committed no error in so doing and if it did the appellant cured the error by immediately proceeding to bring out and develop the fact from respondent's attorney on cross examination that the "first lawsuit was settled for $2500."

It also alleges that the court committed error in submitting a form of verdict in case the jury found for the respondent—in blank, to be filled out by the jury, which they did. Such a blank form could not possibly have misled a jury of sufficient intelligence to sit in the case where they were properly instructed as to the elements constituting the damages in the event they found the issues for the respondent.

It also claims that it was error to permit respondent's counsel to state what argument appellant's counsel had made in other cases between the same parties on the same policy. The record does not sustain such assignment of error. The respondent, in giving his testimony, was asked whether, on a former trial, he had been criticized for not trying to work, to which objection was made and sustained. Appellant also contends:

"This is a suit upon a written contract. Plaintiff was either entitled to the amount he sued for or not. He sued for $78.80 for return of premiums paid by plaintiff; the verdict was for $78 on that item. It should have been for $78.80 or nothing. . . ."

It seeks to sustain this contention by citing decisions that, where the damages are liquidated and fixed by written contract, if the jury disregards the instructions of the court and attempts to render a compromise verdict contrary thereto, the verdict will be set aside whether it is for more or less than the liquidated damages. The authorities cited have no application. This was merely a clerical and immaterial error, and is directly covered by the statute relating thereto. The statute expressly provides that a verdict shall not be disturbed "for any mistake . . . in any sum of money . . . by which neither party shall have been prejudiced." [Sec. 1099, R. S. 1929.]

None of these errors could be sustained unless the court should disregard the statutory admonition iterated and reiterated, that the court must disregard errors and defects in pleadings or proceedings "which shall not affect the substantial rights of the adverse party." [Secs. 821, 1062, 1099, 1100, 6286 and 6320, R. S. 1929.] Under the statutes *supra* we hold that each and all of the alleged errors, if they in fact be errors, do not affect the substantial rights of the appellant in this case, and, therefore, should be and are disregarded.

## V.

Appellant contends that the court erred in submitting to the jury the question of the vexatious refusal of appellant to pay the policy, and that the allowance of that item is without any substantial evidence to support it. We do not agree with this contention. On the contrary, we have endeavored to point out that whether you adopt the theory

of the respondent or that of appellant in the instant case, the respondent was entitled to recover on the policy sued on as it is conceded that there was substantial evidence upon which the jury could and did find that respondent was totally and permanently disabled. There being substantial evidence upon which to base such a finding, as is conceded, under the terms of the policy it became entirely immaterial whether such total permanent disability was occasioned by the fact that respondent actually had the diseases as testified to by his physicians, or whether he only thought he had them, as testified to by appellant's physician. In either event he was totally and permanently disabled unless he is, in fact, a malingerer. Unless the appellant had tendered such an issue and supported it by some substantial evidence, it is perfectly apparent that the respondent was entitled to recover on the policy, as it is expressly conceded that there was substantial evidence upon which to find (and in fact there was nothing to the contrary) that he was permanently and totally disabled. The appellant should not have attempted, without such evidence, to defend the suit by relying upon the ingenuity of counsel to assign numerous harmless errors and, by so doing, brought itself within the provisions of the statute justifying the court in the submission of the issue of vexatious refusal to pay the policy, and justifying the jury in finding this issue against the appellant, as it did. [Klaber v. O'Malley, 90 S. W. (2d) 396.]

On the entire record in the case, we think the judgment is for the right party and should be and is affirmed. *Fulbright* and *Smith, JJ.,* concur.

### On Motion for Rehearing.

The appellant has filed a motion for a rehearing in the above entitled case, the first, and apparently the principal ground alleged therefor being:

"The first statement in the opinion handed down in this cause is erroneous. It says:

" 'This is a suit on a health insurance policy.'

"This is a fundamental error. An examination of the policy sued upon discloses that it is a regular life insurance policy which contains a total and permanent disability clause. . . ."

The opinion, following the statement complained of, sets forth, in quotations, the provision contained in the policy relating to the disability clause. The fact that it is contained in a life insurance policy is certainly immaterial, as is the designation of the character of the policy. All that is involved in this case is the disability clause, and the statement in the opinion designating it as a health insurance policy, whether an accurate or an inaccurate designation, is entirely beside the question involved, is in no way prejudicial to the appellant, and is clearly no ground for a rehearing.

148

The next point assigned is with reference to the following recital on page 6 of the opinion:

"Respondent started paying regular premiums, and in 1938, filed suit, which suit was compromised."

The recital is wholly immaterial and unimportant and should be, and is, stricken out, as the suit was actually filed on the 26th day of August, 1939. The abstract, with reference to this matter, shows:

". . . When they discontinued paying me the Prudential had me submit myself, I believe, to Dr. Kneibert for an examination. After they discontinued paying me in April, 1932, I started paying my regular premiums to the insurance company and continued to pay them.

. . . . . .

". . . Dr. Aitken examined me some time in the fall of 1935, and the company started paying me again in January, 1936, and continued paying me until December 16, 1938. My last payment was received December 16, 1938.

. . . . . .

". . . The company discontinued payments on January 16, 1939; that was when my next payment was due."

The inaccurate statement *supra* in no way affects the conclusion reached in the case, and constitutes no ground for a rehearing.

The third ground assigned is:

"This opinion holds, in effect, we might say directly holds, on page 11 of the opinion, that if a man thinks he is totally and permanently disabled, that that makes him totally and permanently disabled and entitled to the benefits of the total and permanent disability clause in the policy."

The opinion does directly hold that, under the express terms of the policy in the instant case, it is immaterial what caused the insured's total disability; that is, whether it was caused by his mental condition, as testified to by the insurance company's expert, or whether it was caused by the diseases his physicians testified he had. The fact still remains that, under the unambiguous provision of the policy and the undisputed evidence in the case, whether you adopt the theory of the insured or that of the insurance company, you come out at the same place; that the insured was totally and permanently disabled within the express provisions of the policy.

There is no possible escape from this inevitable conclusion, for, under the express provision of the policy, the cause of the disability is entirely immaterial. The policy says: "If the Insured shall become totally and permanently disabled, either physically or mentally, from any cause whatsoever, . . . while this Policy is in full force and effect and the Insured is less than sixty years of age," etc., then insured is entitled to the benefits provided for in the policy.

It is unnecessary to decide in this case whether the court could have submitted solely the question of permanent disability and treated the causes alleged in the petition as surplusage. It did not do so. It would seem as if the court could have done so without committing error. Mitchell v. Wabash R. R., 334 Mo. 926, l. c. 937, where the rule is announced as follows:

"The rule is that proof is only required of those allegations necessary to a recovery, and that those unnecessary to that end may be eliminated as surplusage."

The holding of the court in the instant case does not open the door for fraud, as contended by the counsel for appellant. If the door is opened it is opened by the terms of the policy and not by the opinion in this case. The insured ordinarily might have some difficulty in proving total disability without showing some disease. No such difficulty exists in the instant case, for the reason that the insurance company itself made such proof.

Appellant complains of the court's use of the word "hypochondriac." Appellant's expert did not use the word, but he did use substantially the definition that the dictionary gives of the word, which is "A mental disorder characterized by morbid anxiety as to the patient's health, often associated with simulation of diseases and frequently developing into melancholia." (Webster's New International Dictionary.) Appellant's expert says the insured "has what we term a chronic invalid reaction which is purely mental," and does not express the opinion that he simulated the diseases, or that the condition is not permanent. Hence, we do not think that the appellant has any ground for complaint on account of the use of the word "hypochondriac" in the instant case.

Counsel for the appellant also complains of the use of the word "conceded" with reference to the insured's proof of disability, and says: "The word 'conceded' is not in the record nor in the brief prepared by this appellant, and to say that the appellant expressly concedes certain facts is not in accord with the record, and should be eliminated from this opinion."

Appellant's first assignment of error contains the following:

". . . He (meaning the insured) offered proof tending to support his claim of being totally and permanently disabled at the time of the trial and in January, 1939, and that he had been suffering from some of the diseases mentioned in evidence, in 1935, . . ."

This is certainly a concession upon the appellant's part that there was substantial evidence offered by the insured to support his claim of disability, and the statement in the opinion complained of is justified by the record.

The appellant's motion is a mere criticism of the opinion with reference to immaterial matters, but entirely fails to point out any reason

why the result reached in the instant case is erroneous so that a rehearing should be granted. The motion is, therefore, overruled. *Smith* and *Fulbright, JJ.*, concur.