Oscar ERBES, Respondent,

v.

**UNION ELECTRIC COMPANY,**
a corporation, Appellant.

No. 48501.

Supreme Court of Missouri,

Division No. 1.

Feb. 12, 1962.

William H. Ferrell, Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, for appellant.

Donald Gunn and Barnhart & Sommers, by Don B. Sommers, St. Louis, for respondent.

HOLMAN, Commissioner.

On October 1, 1957, plaintiff was engaged in his employment as an ironworker in the construction of a new Southwestern Bell Telephone building at the corner of Main and McKinley Streets in the City of Union, Missouri. Upon the date mentioned he was severely shocked and burned when a cable he was holding made contact with one of the wires of defendant's 34,500-volt overhead subtransmission line which ran along the west side of McKinley Street. The trial of this action resulted in a verdict for plaintiff in the sum of $75,000. Plaintiff entered a required remittitur of $15,000 and defendant has duly appealed from the ensuing $60,000 judgment.

The two-story building mentioned was being constructed on the northwest corner of the intersection by Plez Lewis Construction Company, the general contractor. For many years defendant had maintained a pole line at this point along the west side of McKinley Street. On the top crossarm were three bare copper wires constituting the 34,500-volt circuit. Another crossarm below contained the wires, also uninsulated, of a 7,200-volt circuit. The poles were 105 feet apart. At the low point of the "sag" the wires of the higher circuit were 32 feet above the ground and those of the 7,200-

volt circuit were six feet lower. A barricade had been placed across McKinley at Main and the portion of McKinley Street adjacent to the building site had been used to store building materials.

On the morning in question plaintiff and his foreman, Steve Tourville, were engaged in installing two lintels on the east side of the building. These lintels were about 14 feet long and are described as metal beams or plates that are placed at the top of a window or door opening so as to support the wall above. In doing this work they were using a crane which was mounted on a truck bed and was being operated by Johnny Bay. The crane had a 40-foot boom and there was a ⅝-inch metal cable which ran from a drum on the truck bed over the top of the boom and then dropped vertically to the ground. On the end of the cable was a large metal hook and a short distance above the hook was a "headache" ball. This ball is a heavy metal cylinder 12 to 14 inches long and 6 inches in diameter. It weighs about 60 pounds and its weight causes the cable to descend when the brake on the drum is released.

There was a metal scaffold along the east side of the building which extended out about five feet. On the morning of the casualty the crane truck was positioned parallel to the side of the building about as near the east wall as the scaffolding would permit. The boom was lowered and used to move the lintels from the street to the area alongside the building. The boom was then raised to a 70-degree angle and was about 40 feet above the ground and from six to eight feet west of the west wire of each of defendant's high-voltage circuits. At this point it was discovered that one of the lintels was bent and would need to be straightened before being installed. They attempted to do so with a hammer but were not successful. Plaintiff then decided to use the "headache" ball as a hammer and drop it on the lintel in an effort to straighten it. He tried it once and then requested that Johnny give him more slack so that the full force of the ball would strike the

lintel. Johnny let out from two to four feet more cable. Steve was holding the lintel and plaintiff had one hand on the hook and the other on the cable. When he struck the second blow a ball of fire came down the cable. Steve was knocked ten feet away and plaintiff fell back on a pile of straw which was ignited by the charge. The movement of the headache ball had caused the slacked cable above to whip about in the air to the extent that it contacted the westerly wires of defendant's nearby high-voltage circuits. In addition to receiving burns from the electricity plaintiff's right leg was severely burned by the straw fire before he could be dragged away and the fire in his clothing extinguished. He was removed by ambulance to the St. Francis Hospital in Washington, Missouri, and three days later was taken to St. John's Hospital in St. Louis. The extent of his injuries will be hereinafter detailed in connection with our consideration of the claim that the judgment is excessive.

Steve Tourville testified that the wires were in plain sight but he did not know that they carried electricity or that they were uninsulated; that he would not have intentionally touched them because he would not purposely touch any wire; that there were no warning signs concerning those wires; that on other projects where he had worked near high-voltage uninsulated wires there had been warning signs such as "Caution, High Voltage"; that on a few other occasions he had seen a headache ball used in the manner plaintiff was using it.

Johnny Bay testified that he did not know the wires were uninsulated or that they were high-voltage wires; that there were no warning signs and no one had told them that they were high-voltage uninsulated wires; that just as plaintiff hit the lintel the second time he (Johnny) had shouted a warning to "watch the wires"; that he didn't know why he attempted to warn them because it hadn't entered his mind that the cable might flip into the wires. On cross-examination Johnny stated that the boom could have been lowered to a point be-

low the wires in about two minutes and that the headache ball could have been detached from the cable in about 15 minutes.

Plaintiff testified that he was 38 years old at trial time; that he had seen these wires but didn't know they were uninsulated and didn't think they carried electricity although he wouldn't have touched them deliberately; that he hadn't thought about the cable swaying back and forth in the air; that on practically all other jobs where he had worked near uninsulated high-voltage wires there had been warning signs; that he had worked on this job about five weeks in the early summer of 1957 and two days about a week before the casualty; that it was a common practice to use a headache ball as a hammer.

The deposition of defendant's district engineer, John W. McLaughlin, was read into evidence by plaintiff, and he also testified in person as a witness for defendant. This witness stated that early in 1957 the architects had sent him a sketch of the building in question and had written about the manner of furnishing power for it; that 40-foot poles had been used on the instant line but that defendant had poles in storage in 45, 50, 55, and 60-foot lengths; that defendant did not follow a practice of posting warnings except at substations; that no warnings were given or other precautions taken to guard the lines in this construction area; that a 34,500-volt wire could not be insulated; that four-foot line guards made of fiber are used on high-voltage wires to protect men working on poles; that if line guards were used to cover a 105-foot span it would increase the weight 260 pounds and the wind and vibration would probably break the wire; that in the event of insulation additional poles could have been installed and thus have reduced the weight on the wires; that this 34,500-volt circuit was 32 feet above ground and the minimum requirement of the National Electrical Safety Code was 22 feet; that he had seen a crane working around the building but not in the area of defend-

ant's wires; that he made no inquiry concerning the use that would be made of cranes in constructing the building; that no attempt had been made to erect guards for these lines or to raise the lines by substituting 60-foot poles; that he had passed this building once a week during the construction period and had seen the materials stock-piled in McKinley Street; that if the contractor had so requested defendant would have raised the lines or defendant would have relocated the lines at the expense of the contractor if the contractor had requested that such be done. This witness further testified that the contact of the cable with defendant's circuits had caused a power failure in the area and he had gone to the scene of the casualty shortly after it occurred and had observed burned contact marks on the cable and on the west wires of both the 34,500 and 7,200-volt circuits.

Defendant offered the testimony of Paul Crawford, a registered professional engineer, who stated that he was employed by L. E. Meyers Company in doing the engineering work for the construction of electric transmission lines. He testified that insulated 34,500-volt wires were not in existence and that there was no way to join line guards so as to completely cover a span of 100 feet. Upon cross-examination he stated that a longer crossarm could have been attached to the poles at either end of the 105-foot span and a "dead" wire affixed to each end of it which would have guarded the live wires and prevented a cable from coming in contact with them.

Defendant also presented the testimony of Mrs. Frank Carter, a shorthand reporter, who stated that she accompanied Mr. Wehmeyer of the Union Electric Company to St. Francis Hospital at Union on October 2, 1957, at which time Mr. Wehmeyer questioned plaintiff concerning the instant occurrence. She read questions and answers from her notes which indicated that plaintiff said he knew the wires were there and that "they all talked about the hot wires but I didn't know how hot they were," and.

that "there must have been too much slack in that line." In this connection it should perhaps be stated that when plaintiff was questioned on cross-examination about this interrogation at the hospital the day after his injury he stated that he had no recollection of Mr. Wehmeyer or Mrs. Carter having been there.

Defendant's first contention is that the trial court erred in overruling its motion to set aside the verdict and enter judgment for the defendant, which motion was based upon the grounds that (1) the evidence failed to make a submissible case of negligence, and (2) the evidence showed that plaintiff was guilty of contributory negligence as a matter of law.

In considering whether plaintiff made a submissible case we deem it advisable to review plaintiff's verdict-directing instruction (No. 1). It is rather long and, for convenience, will be divided into two parts. The first part contains findings required which relate to a determination of defendant's duty. Such reads, in part, as follows: " * * * [A]nd if you find that no warning signs were posted on said job site calling attention to the fact that said power lines carried high-voltage electric current and were uninsulated, and if you find that by reason thereof there existed a reasonable likelihood or probability that someone lawfully within said area would be endangered thereby, and if you find that the defendant Union Electric Company, acting through its agents and employees, knew of the aforesaid circumstances and conditions, or in the exercise of the highest degree of care could have known thereof, then the court instructs you that under the law of the State of Missouri the defendant, Union Electric Company, owed the non-delegable duty to exercise the highest degree of care to avail itself of every protection and precaution reasonably available and accessible, at its own expense to erect an adequate and sufficient guard, or to insulate its said power lines, or to isolate said power lines by elevating said power lines at an adequate and safe height above said operations, or by relocating said power lines so as not to endanger anyone whose business or employment might require them to be within said area for any lawful purpose and who might in the course of such use or employment, by accident or inadvertence and without apprehending the danger thereof, come or be brought into dangerous proximity with said power lines and be injured as a direct result thereof. Any failure on the part of the defendant, Union Electric Company, to discharge this duty constitutes negligence *. * *.''

Thereafter, the instruction requires specific findings of fact relating to the manner of plaintiff's injury, including a finding that plaintiff was exercising the degree of care that a reasonably prudent person would have exercised under the same or similar circumstances, and then told the jury that "if you find that the defendant, Union Electric Company, in the exercise of the highest degree of care and at its own expense, prior thereto could and should have adequately and sufficiently guarded said power lines, or isolated said power lines by elevating them an adequate and safe height in the air or by relocating said power lines and thereby made said area reasonably safe for use by all persons who might reasonably be expected to be in said area on any lawful purpose, and if you find that the defendant failed to take any one of said precautions, and that in this respect it failed to exercise the highest degree of care, then the court instructs you that in this respect the defendant was negligent and * * * plaintiff is entitled to recover."

█ In determining defendant's contention that plaintiff failed to make a submissible case (as well as the contention that he was guilty of contributory negligence as a matter of law) we view the evidence in the light most favorable to plaintiff, give him the benefit of all favorable inferences arising therefrom, and disregard defendant's evidence unless it aids plaintiff. De Mariano v. St. Louis Public Service

Company, Mo.Sup., 340 S.W.2d 735; Kickham v. Carter, Mo.Sup., 314 S.W.2d 902.

"Suppliers of electricity must exercise the highest degree of care to keep their wires in such condition as to prevent injury to others who lawfully may be in close proximity to those wires. Smith v. Southwest Missouri R. Co., 333 Mo. 314, 320 [1], 62 S.W.2d 761, 763 [2–4]; Thornton v. Union Electric Light & Power Co., 230 Mo.App. 637, 644, 72 S.W.2d 161, 164 [4]. Of course, as defendant points out, this duty did not make instant defendant an insurer of the safety of all persons. But defendant was required to use the highest degree of care to prevent injury which it could reasonably anticipate. It was not necessary, however, that defendant should have anticipated the exact injury which did occur or the exact manner in which the injury occurred. It was sufficient that a jury reasonably could find that defendant reasonably should have anticipated that some injury was likely to occur to one lawfully at or near the tree in question by reason of the presence of the line in its particular location." Lebow v. Missouri Public Service Co., Mo.Sup., 270 S.W.2d 713, 715. In the Thornton case, supra, it is said that "Electricity is a most subtle and dangerous agency. It lurks unsuspected in the simple and harmless wire, and gives no warning of its deadly presence. Wherefore, it is uniformly held that an electric company employing wires highly charged with this subtle and violent agency in streets, highways, or other public places, is in duty bound either to insulate such wires or place them beyond the range of contact with persons rightfully using such streets, highways, or places, and to exercise the utmost care to keep them so." 72 S.W.2d 164.

■ We have recently said that "a duty to insulate wires has often been stated by this Court. 18 Am.Jur. 485, Sec. 93; 29 C.J.S. Electricity § 44, p. 589; Geismann v. Missouri-Edison Electric Co., 173 Mo. 654, 73 S.W. 654; Williams v. Springfield Gas & Electric Co., 274 Mo. 1, 202 S.W. 1; Godfrey v. Kansas City Light & Power Co., 299 Mo. 472, 253 S.W. 233. If it is true, as indicated by defendant's evidence, that it is impossible to fully insulate wires carrying such high voltage as these, then certainly the exercise of the highest degree of care requires that such wires be so isolated that they will not be likely to cause injury to persons in places where they may lawfully be and may be reasonably expected." Gladden v. Missouri Public Service Co., Mo.Sup., 277 S.W.2d 510, 515. Of course, it clearly appears from the evidence that defendant could have used one of the three methods hypothesized in Instruction No. 1, and in that event workmen on this construction project would have been reasonably protected from the danger of contact with said wires. Whether defendant should have taken one of those protective steps requires a determination of the question as to whether, under all the facts and circumstances in evidence, defendant, in the exercise of the highest degree of care, should reasonably have anticipated that someone lawfully in the area was likely to be injured as a result of contact with those high-voltage wires.

We have concluded that there was sufficient substantial evidence in this case from which a jury reasonably could have found that defendant, in the exercise of the highest degree of care, should have foreseen the reasonable likelihood that some of the persons engaged in the construction of the instant building would have been injured as a result of the nature and location of said power lines. In that connection we observe that since defendant had seen fit to bring a 34,500-volt subtransmission line into and through a city having a population of about 3,500 people its agents should have been especially alert in their efforts to detect and remedy dangerous situations that might arise as a result of the location of that line. It has been said that "where the wires maintained by a company are designed to carry a strong and powerful current of electricity, so that persons coming

in contact with them are certain to be seriously injured, if not killed, the law imposes upon the company the duty of exercising the utmost care and prudence consistent with the practical operation of its plant to prevent such injury, especially where high-tension wires are suspended over the streets of populous cities or towns, for here the danger is great, and the care exercised must be commensurate with it." 18 Am.Jur., Electricity, § 48, pp. 445, 446.

The conclusion stated at the beginning of the preceding paragraph is particularly supported by the following: (1) The uninsulated wires carried a very high voltage and were located in the business district of a city, (2) the wires were within about 21 feet of the east wall of the building being constructed, (3) building materials were stored in McKinley Street where they ordinarily would be transported under the wires in question in being taken to the building, (4) defendant's district engineer had knowledge that the building was to be constructed, its general plan, and such other knowledge of the situation as would be received by a casual once-a-week observation of the building, (5) said engineer had observed a crane being used upon this project, (6) defendant knew that it had given no warning to the men employed at that site concerning the high voltage of these wires and the dangers incident to working in close proximity thereto, and (7) defendant is charged with knowledge that the erection of the scaffolding along the east side of the building reduced by five feet the working area between the building and the wires. These factors, and perhaps others, should have caused defendant to reasonably anticipate that some workman on that project would be reasonably likely to receive injury in some manner as a result of working in close proximity to said wires.

In support of its contention that no submissible case was made defendant places chief reliance upon the cases of Manaia v. Potomac Electric Power Co., 4 Cir., 268 F.2d 793, and Berry v. Atlantic Coast Line R. Co. et al., 4 Cir., 273 F.2d 572. These cases are distinguishable from the case at bar upon the facts. The Manaia case involved a paving project with a transmission line crossing the street being paved. A crane was used under the power line to lift a paving machine onto tracks. The crane operator deliberately operated the boom close to the line and electricity entered it killing two workmen who were holding the paving machine. The project could have been accomplished with the crane positioned so that it would not have been under the power line. The court held that defendant was not negligent because it could not be held to have anticipated that the contractor would use such a dangerous method when an equally practical alternative was available which entailed no risk. In Berry, plaintiff's decedent was electrocuted when a crane unloading a car of steel was caused to tilt and contact a nearby power line. The crane operator was fully aware of the danger from the power line and failed to take adequate precautionary measures available. The court followed the Manaia case and held that the power company would not reasonably have anticipated the negligent acts of the operator and hence it was not negligent. While, as stated, the factual situation in the instant case is different from those involved in the Manaia and Berry cases, we make the observation that the court in those cases gave very little consideration to the rule that the power company need not anticipate the exact injury that occurred or the exact manner in which it occurred.

In the case before us there were, of course, other methods that could have been used to straighten the lintel which, in hindsight, would have been safe. However, we do not think that fact would necessarily indicate that defendant was not negligent. As we view the situation, defendant, for reasons heretofore stated, reasonably should have anticipated that in the over-all construction project some workman was reasonably likely to sustain injuries by reason of the close proximity of said wires.

We are of the opinion that under the facts and circumstances in evidence plaintiff was not guilty of contributory negligence as a matter of law. There was evidence to indicate that plaintiff did not know that these wires were uninsulated electric wires, and it was conceded that defendant had not warned him of the extreme high voltage thereof. He testified that it was a common practice to use a headache ball as a hammer. When he asked the operator for a "little more slack" there is nothing to indicate that he knew the operator would give him more than was required, or so much more as to make it possible for contact to occur between the cable and the high-voltage wires. Also, we do not think that plaintiff, when he used the ball in the manner he did, would necessarily know or suspect that the ⅝-inch steel cable would whip about in the air to the extent that it would travel from six to eight feet in an easterly direction and thus contact defendant's wires. Under the circumstances shown, we are clearly of the view that the issue of plaintiff's contributory negligence was properly submitted to the jury for its determination. Lebow v. Missouri Public Service Co., supra; Potter v. Sac-Osage Electric Cooperative, Inc., Mo.Sup., 335 S.W.2d 192. Defendant, in support of its contention to the contrary, has cited the case of Hamilton v. Laclede Electric Cooperative, Mo.Sup., 294 S.W.2d 11, but that case is so factually different from the instant case that it lends little, if any, support to defendant's position.

Defendant complains that Instruction No. 1 was prejudicially erroneous in that in two respects it was not supported by the evidence. It required a finding that the contractor "undertook to erect a two-story commercial building for the Southwestern Bell Telephone Company on the northwest corner of Main and McKinley Streets * * * and if you find that in the erection of said building McKinley Street, in the block north of Main Street, was barricaded and used as an area in which to store building material used in the erection of said building and that cranes were frequently employed at said location in the erection of said building * * *." Defendant says the submission that "cranes were frequently employed at said location" referred to the area adjacent to McKinley Street and that such was not supported by the evidence. We do not think it is clear whether the submission complained of referred to the specific area involved or the construction site in general. However, there was evidence that a crane was being used on the east side of the building on the morning of the occurrence in question and that cranes had theretofore been frequently used at other locations on the building site. In view of that evidence we do not think the instruction was prejudicially erroneous in the respect complained of.

There is no merit in defendant's contention that there was no evidence to support the submission in said instruction that defendant "could and should have adequately and sufficiently guarded said power lines." The testimony of Paul Crawford would support a finding that a dead wire could have been placed at the end of a longer crossarm and that such would have prevented the cable from coming in contact with the live wires.

Another contention of defendant is that the court erred in permitting plaintiff's medical expert, Dr. Scherman, to testify that plaintiff "is fifty percent disabled as a whole man." Defendant's counsel objected to the question "as speculative and I don't know what it means; it is cryptic, invades the province of the jury." In its brief defendant states its primary contention here as follows: "The real point, however, is that testimony of this sort is just too abstruse, too speculative for submission to a jury." We ruled a somewhat similar contention in the recent case of Knipp v. Mankin, Mo.Sup., 336 S.W.2d 371, wherein we held it was not error to permit an expert to express the opinion that plaintiff had a fifty percent disability in his back. In so ruling we stated that "In Missouri

the courts have held that an expert may express the opinion that an injury is permanent, Mahany v. Kansas City Rys. Co., 286 Mo. 601, 228 S.W. 821, and that the plaintiff is totally disabled. Stearns v. Prudential Ins. Co. of America, 235 Mo.App. 135, 140 S.W.2d 766. If it is proper for an expert to express the opinion that a person is totally disabled it would seem proper to permit expert testimony that he has sustained a percentage of disability. We have been unable to think of any logical reason why a qualified medical expert should not be permitted to express the opinion that a person has sustained a certain percentage of disability in a certain area of the body." 336 S.W.2d 375. What we said in that case will indicate our view that the trial court did not err in admitting the testimony in question.

■ Defendant also says this opinion was not admissible because it was based on hearsay. This reason cannot be considered as a ground for the exclusion of the evidence when originally offered because such was not assigned in the objection made. Defendant cross-examined Dr. Scherman at length as to the basis of the opinion in question and finally obtained a statement that the opinion was based in part upon what plaintiff had told him "about the character of the accident he suffered." Defendant then moved "that the witness' testimony about the percent of disability be stricken as founded on hearsay evidence," which motion was overruled. Defendant in its brief has not assigned the ruling on said motion to strike as error but does mention it in the argument upon the point now being considered. In any event, the failure of the court to sustain the motion to strike would not be reversible error because (1) the facts concerning the nature of plaintiff's accident had been given to the doctor, during his testimony concerning disability, by means of a hypothetical question, and (2) similar testimony was given by Dr. Pearl, i. e., that plaintiff "is totally disabled from forty to fifty percent of a man," and there was no objection or motion to strike that opinion

on the ground that it was based on hearsay or for any other valid reason. See Hunter v. St. Louis-Southwestern Ry. Co., Mo.Sup., 315 S.W.2d 689 [5], and Hill v. St. Louis Public Service Co., 359 Mo. 220, 221 S.W. 2d 130 [7].

George Hagemann testified for plaintiff to the effect that he was a claim manager for an insurance company that carried the workmen's compensation insurance for plaintiff's employer; that a workmen's compensation claim was presented by plaintiff; that his company paid medical and hospital expenses for plaintiff's treatment in the total sum of $5,350.02; that he had paid hospital and medical expenses in connection with approximately 40,000 claims, and in his opinion the bills for the treatment of plaintiff were reasonable.

■ Defendant contends that the court erred in giving Instruction No. 14 which told the jury that it "must not make any reduction in the amount of damages that you find that plaintiff is entitled to receive * * * by reason of the fact that plaintiff * * * was entitled to the benefits of the Missouri Workmen's Compensation Law because, under the provisions of said law in the event that plaintiff recovers herein, he must reimburse his employer's workmen's compensation insurer for all sums of money received by him as compensation payments and all sums of money expended by them in furnishing plaintiff medical care." It is said that the giving of the instruction was error because there was no evidence of any workmen's compensation payments to plaintiff and "it impliedly invites the jury to speculate about the amount of such payments and to take such speculation into account when determining damages." We do not see how defendant could have been prejudiced by this instruction. It was a cautionary instruction which told the jury, in effect, not to deduct any amount from its verdict because of benefits plaintiff may have received under the workmen's compensation law because he would have to repay those amounts out of his judgment. In

view of the negative direction contained in the instruction it is of no consequence that the evidence did not disclose the amount of the benefits that had been paid and we see no reason why the jury would have speculated about the amount in making its determination of the amount of plaintiff's damages.

■ Defendant also complains that Instruction No. 15 was erroneous because it included as an item of damages "the reasonable value of hospital, medical and surgical expenses reasonably and necessarily expended." It is said that there was no evidence of the reasonableness of such expenses. We do not agree. There was evidence that the amount claimed had been paid and we have held that the presentation of the bills and their payment is some evidence that the charges were reasonable. Myers v. Karchmer, Mo.Sup., 313 S.W.2d 697. Moreover, it would seem that the vast experience of Mr. Hagemann in the approval and payment of medical expenses would have been sufficient to qualify him to testify, as he did, that these charges were reasonable. This contention is ruled adversely to defendant.

■ Defendant also contends that the court erred in admitting medical testimony that, as a result of the instant casualty, plaintiff suffered a lung "blowout" which followed a pulmonary embolism and caused death to a certain part of the right lung, for the reason that said evidence was outside the scope of the pleadings. Among other things the petition alleged that plaintiff's "internal organs and body" were permanently injured. The question presented is whether that allegation is a sufficient specification to permit proof of the injury to plaintiff's lung. The decisions of the appellate courts of this state do not appear to be in strict harmony upon that question. The following cases would tend to support a ruling that the evidence was admissible under the quoted allegation: Devine v. Kroger Grocery & Baking Co., 349 Mo. 621, 162 S.W.2d 813 [15]; Gurley v. Mo. Pac.

Ry. Co., 122 Mo. 141, 26 S.W. 953 [3]; Fuchs v. St. Louis Transit Co., 111 Mo.App. 574, 86 S.W. 458 [3]; Van Cleve v. St. Louis M. & S. E. R. Co., 124 Mo.App. 224, 101 S.W. 632 [1]; Haywood v. Kuhn, 168 Mo.App. 56, 151 S.W. 204 [1]; Van De Vere v. Kansas City, Mo.App., 196 S.W. 785 [10]; Swinehart v. Kansas City Rys. Co., Mo.App., 233 S.W. 59 [1]; Malone v. Kansas City Rys. Co., Mo.App., 232 S.W. 782 [8]; Price v. Met. St. R. Co., 220 Mo. 435, 119 S.W. 932 [12]. On the other hand, decisions in the following cases would tend to require that the injuries complained of be particularized and specifically alleged in order to permit proof thereof: Taylor v. Kansas City Southern Ry. Co., Mo.Sup., 293 S.W.2d 894 [2]; Ziervogel v. Royal Packing Co., Mo.App., 225 S.W.2d 798 [1, 2]; Chawkley v. Wabash Ry. Co., 317 Mo. 782, 297 S.W. 20 [16, 17]; Connor v. Kansas City Rys. Co., 298 Mo. 18, 250 S. W. 574 [1]; Walquist v. Kansas City Rys. Co., 292 Mo. 34, 237 S.W. 493 [5]; Hibler v. Kansas City Rys. Co., 292 Mo. 14, 237 S.W. 1014 [3, 4, 5].

A number of the cases in the first group heretofore cited appear to give considerable significance to the fact that the defendant therein did not seek a more definite specification of the injuries alleged by filing a motion to make such allegations more definite and certain. Also, we note that in the instant case, prior to the rulings complained of, similar testimony, without objection, was given by Dr. Scherman as follows: "Also, some two weeks after this accident he suffered a thrombus or a clot into his lung with considerable pain in his right chest, collapse and shortness of breath. At the present time he still complains of shortness of the breath and weakness and occasional episodes of pain in the right chest region."

We have concluded that the trial court did not commit reversible error in admitting the evidence under consideration. Our decision is supported by the following factors or reasons: (1) The petition alleged that plaintiff's "internal organs" had been per-

manently injured and, of course, his lung is an internal organ; (2) no motion to make more definite and certain was filed by defendant; and (3) other evidence of the injury in question was admitted without objection prior to the admission of the evidence of which complaint is now made.

■ The final point briefed by defendant is that the judgment, after trial court remittitur, is still greatly excessive. Before discussing that question we will state the evidence relating to plaintiff's injuries and his condition at trial time. Plaintiff remained in St. John's Hospital until December 3, 1957. At the time of discharge the hospital record entries were as follows: "Final diagnosis: '1) Electrical burns, second and third degree, involving both hands and both feet. 2) Fire burns, second and third degree, involving leg and thigh, right. Pulmonary embolism. Skin grafts, split thickness. Case summary: Patient entered for the treatment of electrical burns involving both hands and feet and fire burns involving the leg and thigh. These areas required repeated dressings, debridements, and skin grafts. Course complicated by pulmonary embolus. Made eventual fine recovery from all conditions but convalescence will be prolonged and he is discharged to continue this at home.' "

During the period of plaintiff's hospitalization a number of operations were performed in which skin was taken from both his thighs and grafted upon the burned areas. Skin grafts were made upon both hands and both feet to repair damage where the current entered and left the body. Also, grafts were made upon a considerable area of the right leg where plaintiff had sustained fire burns. Dr. Scherman testified these were "excellent skin grafts" but certain areas tend to break down and they may need alteration at some future time; that as a result of the injuries plaintiff had a limitation of the use of the middle finger and some weakness of grip in the right hand; that there was some numbness and limitation of motion in the thumb of the left

hand; that the nerves and sweat glands in the skin graft areas are impaired which results in some numbness and in inability to react normally to temperature changes so that plaintiff often has a dry and prickly sensation in those areas; that the condition of his right lung, as a result of the "blowout" heretofore described, is permanent; that plaintiff is suffering from nervousness and the whole body was affected by the electrical shock; that "on the basis of the disability which he has acquired I believe the man is fifty percent disabled as a whole man."

Plaintiff testified that he suffered "terrible pain" from the burns for a time after the casualty; that after his discharge from the hospital he continued to receive treatment from Dr. Lahey of St. Louis, and Dr. Pearl of St. Clair; that he returned to work in June 1958 and during the balance of that year his friends on the job helped him by doing the hard work; that during 1959 and the first half of 1960 he had worked on one job continuously as a foreman of ironworkers which did not require manual labor. He further testified that he earned $6,262 in 1956, $4,467 in 1957, $3,467 in 1958, and $7,921 in 1959.

In regard to pain and the ability to use the various parts of his body plaintiff stated that his hands hurt when he uses them and that use of his hands for a period of time will sometimes cause the graft areas to break down and bleed; that there is constant pain in the scar on top of the right foot and the left foot "breaks down and it is just like walking on a nail"; that the scar areas are cold in winter and itch in summer; that he now tires easily and has been nervous since he was injured; that he stuttered before the accident but that condition is gradually getting worse, "it is horrifying." Plaintiff also stated that his present job as foreman was about over, he didn't expect to be able to get further work as a foreman, and he seemed in doubt concerning his ability to do the work required in order to have steady employment as an ironworker.

Dr. Pearl was of the opinion that plaintiff's body was damaged all along the path taken by the electrical current; that before the accident plaintiff was not nervous but since that event he has been "very nervous and irritable"; that the trauma has "possibly" increased plaintiff's speech impairment; that in his opinion plaintiff is disabled "from forty to fifty percent of a man."

" 'There is no precise method for determining the maximum award which the evidence in this case will support. Each case must be considered upon its own peculiar facts. Due regard should be given to the purchasing power of the dollar, to the rule of reasonable uniformity of awards for similar injuries * * *.' Burr v. Kansas City Public Service Co., 365 Mo. 115, 276 S.W. 2d 120, 127. We recognize that it is most difficult to endeavor to maintain a standard of uniformity of judgments in personal injury cases." Carnes v. Kansas City Southern Ry. Co., Mo.Sup., 328 S.W.2d 615, 623. Although we have considered the cases cited, we do not find that any of them are of much assistance from the standpoint of comparable injuries.

We have heretofore stated the facts relating to this problem in some detail and see no occasion for any lengthy discussion of this question. The total of plaintiff's medical expense and loss of wages was about $10,000. He has suffered pain and discomfort in the past and will continue to suffer such to some extent in the future. He will likely lose some future earnings as a result of his injuries, although the extent of such loss is somewhat problematical.

Upon consideration of the facts heretofore outlined, in the light of all relevant factors which should be considered in connection therewith, including the fact that the trial court considered this question and ordered a substantial remittitur, we have concluded that the judgment herein is still excessive and that the maximum amount for which a judgment should be permitted to stand is $50,000. If, within 15 days after the filing of this opinion, plaintiff will enter here a remittitur of $10,000, the judgment will stand affirmed in the sum of $50,-000 as of the date of the original judgment. Otherwise, the judgment will be reversed and the cause remanded for a new trial.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.