Charles CALDERONE,
Respondent-Plaintiff,

v.

ST. JOSEPH LIGHT & POWER COMPANY, Appellant-Defendant.

No. KCD 28568.

Missouri Court of Appeals,
Kansas City District.

Oct. 11, 1977.

Robert E. Douglass, Wilcox & Houts, St. Joseph, for appellant-defendant.

Frank K. Nichols, Pope & Nichols, James O. Turner, Turner & Whetsell, St. Joseph, for respondent-plaintiff.

Before SHANGLER, P. J., and WELBORN and HIGGINS, Special Judges.

SHANGLER, Presiding Judge.

The plaintiff Calderone had judgment for personal injury from contact with a fallen electric power line owned by the defendant St. Joseph Light and Power Company. The plaintiff submitted his case to the jury on the theory that the defendant negligently failed, within a reasonable time after notice, to turn off the power to an uninsulated 7200 volt transmission line which was down and suspended across an intersection. The defendant submitted the contributory negligence of the plaintiff.

On this appeal the defendant Power Company contends for judgment on the ground that the plaintiff was guilty of contributory negligence as a matter of law, or for a new trial on instruction error.

The evidence shows that in the early morning—about 2:30 to 3:00 o'clock a. m.—Lt. Raymond Baker on night patrol for the office of the Buchanan County Sheriff discovered that a car had struck and shorn a utility pole on the northwest corner of Highway 169 and Route FF. He found the car in the ditch thereby and the occupants injured, on the ground.

At this intersection Highway 169 goes east and west and Route FF runs north and south. Route FF does not extend through Highway 169 but is continued north by a gravel road designated South E. Lt. Baker discovered that the top of the utility pole had fallen and that broken wires were strewn on the ground. One wire on that pole remained unbroken and suspended from a crossarm diagonally to an undamaged pole on the southeast corner of the intersection. The unbroken wire was uninsulated and carried 7200 volts. It suspended about two feet above the ground on the edge of the north shoulder of Highway 169, but rose sharply to the pole on the southeast corner of the intersection. That means· that although traffic eastbound on Highway 169 was not impeded, the suspended wire interfered with the movement of westbound vehicles.

Lt. Baker positioned his car in the westbound lane of U.S. 169 to face south down Route FF. The headlights of his car, which were turned on, did not illuminate the suspended wire. He reported the casualty by radio to dispatcher Houghton at the county office and requested him to call an ambulance, notify the Power Company and the Highway Patrol.

It was the testimony of dispatcher Houghton that in response to the call from Lt. Baker he notified the Missouri Highway Patrol of the accident at 2:42 o'clock that morning, called for an ambulance to the scene at 2:48 a. m., and then notified the Power Company at 2:56 a. m. that a pole was down at the intersection of Highway 169 and Route FF. No other inquiry or information passed during the conversation with the Power Company employee.

Another witness for the plaintiff, Chester Jones, was on duty for the defendant Power Company on the day of the event. He received two trouble calls by telephone that morning. The first came around 2:45 a. m. from a party who reported that the lights were out in the vicinity of Agency, Missouri. The second call came about five minutes later, either from the Missouri Highway Patrol or the Sheriff, that a utility pole and line were down on Highway 169. Jones called Cotton, the troubleman, to make the repairs. Cotton drove to the Power Company garage, picked up the company truck and drove to the accident scene.

Ed Swearinger, load dispatcher from the Power Company, was called as a witness for the plaintiff. From his office he controlled the power to eight sub-stations in the area. He testified that he received two telephone calls from the Missouri State Highway Patrol. The first call—before 3:00 a. m.—informed him that a pole had been broken at Highway 169 and Route FF and requested that a repairman be sent to the scene. He thereupon called Pettit, another troubleman, to investigate the difficulty. Pettit went to the Power Company garage for a truck and, in coordination with Cotton in the other truck, undertook to investigate the trouble. It is clear that at all times

after Cotton and Pettit mounted their trucks each was in radio communication with the other and with Swearinger.

The second telephone call from the Highway Patrol informed Swearinger that a man at the accident scene had been burned by the fallen wire. He did not then de-energize that line. Swearinger testified it would have taken him from five to fifteen seconds to cut off the electrical current to the wires at the accident scene by the operation of two buttons within the room of his location, but he did not do so. Nor did he make inquiry during conversations with the Highway Patrol of the particular circumstances of the downed pole and lines. He did not shut off the current to the suspended line because to do so would be to deprive the entire area served by the Ajax substation of power. Swearinger had instructions that in an emergency of this nature the repairman was to investigate the trouble.

This testimony, taken with the evidence of troubleman Pettit and engineer Horn, discloses that the downed lines were on one of the four circuits which carry power from the Ajax substation to the surrounding community. Each circuit feeds a different area. The substation serves about 3500 customers in all. The power to Ajax is received from one 33,000 volt transmission line. It was this main line which Swearinger controlled and could have cut off by manipulation of selector buttons. Had he done so, troubleman Pettit could then have closed the circuit at Ajax which fed the broken line at the accident scene, then called Swearinger to reactivate the main transmission line into Ajax, and thereby returned full power to the other three circuits with only that interruption of service. That procedure would have meant that the only line to remain without power would have been the line by which plaintiff was injured.

As to the incidence of the injury, the evidence was that plaintiff Calderone was an ambulance attendant and had been dispatched to the scene of the accident along with the driver. Baker testified that when the ambulance arrived at the scene he mo-tioned for the vehicle to stop at a point west of the suspended wire. The driver [Reynolds] left the ambulance and walked over to Baker. Then the attendant [Calderone] got out of the ambulance, walked around the rear of the vehicle, and up to Baker and Reynolds. Baker testified that he told the driver about the suspended wire, flashed his light on it, and warned him that the line might be live. He directed the driver to take the ambulance east, under the wire, and then go north on to Route South 4E for safe access to the injured persons lying in the ditch. After the driver began to move the ambulance as directed, Lt. Baker told the plaintiff, then next to him on the north side of the highway west of the suspended wire that the line might be live and played his flashlight on it. Baker then walked away to the center of the highway. The ambulance went under the wire. As it did the antenna struck the suspended wire and "popped" amidst a shower of sparks. [It was then for the first time that Baker actually knew the wire was still live.] At the same time that Baker glanced to his left, saw plaintiff take two or three steps, and walk into the suspended wire. Baker testified that he and Trooper Noyes shouted "not to move, the line was hot". According to Baker, it was only a matter of a few seconds from when the antenna struck the wire, the shouted warning by the officers, and the movement of the plaintiff into the wire, Baker—then only four feet away—saw Calderone burn in a halo of sparks and fire.

Trooper Noyes of the Missouri Highway Patrol was also at the scene. In response to a call he arrived at about 3:00 a. m. He also saw the ambulance antenna strike the suspended wire as the vehicle moved from the west side to the east side of the wire. He saw the plaintiff walk towards the wire and while Calderone was still six to ten feet from the wire shouted a warning to him from about twenty feet away. However, the plaintiff continued to walk into the wire and struck it at about eyebrow level. Noyes testified that only a few seconds elapsed between his warning and the casualty.

Claude Herrin, a witness for defendant, had come upon the scene and recognized Lt. Baker, who was then standing by his patrol car on the east side of the suspended wire. So he crossed over the highway to him. As he recalled the incident from that coign of vantage—some eight feet from the wire—when the ambulance arrived at the scene it did not stop, and Calderone did not emerge, until after it had driven under the wire and pulled up next to the police car on the east side of the suspension. He saw the ambulance antenna strike the wire as it moved from west to east. After the ambulance stopped, Calderone stepped out, presumably to guide the driver to the injured persons. As he did so, he walked back west under the suspended wire—at that point some twelve feet above the ground, then, with his hands in pocket, moved towards the north side of the highway where the live wire slackened closer to the pavement and walked directly into it. When the plaintiff Calderone was one or two steps from the wire, Herrin and Baker shouted a simultaneous warning, but Calderone continued on his path and the casualty ensued. Herrin testified that no one at the scene spoke with anyone in the ambulance before the antenna of that vehicle struck the wire.

Ambulance driver Reynolds also testified for defendant. At his arrival he was stopped west of the strewn wires by a man who beckoned with a flashlight. Reynolds stepped out of the ambulance and could see wires on the ground. The man with the flashlight [presumably Baker] indicated the car in the ditch and warned him to drive with care because wires were down. Reynolds re-entered the ambulance and told attendant Calderone not to emerge until they had gotten through the field of fallen wires. As they drove, the antenna of the ambulance caught a wire momentarily. When they had driven through, attendant Calderone got out of the ambulance and went towards its rear to the south. Reynolds testified that as soon as Calderone left the ambulance, he heard a shout: "Get back in your car" and an instant later, "Your attendant's dead". It was his testimony that, although he was warned that wires were down on the highway, neither he nor Calderone was warned of any wires suspended above them. Reynolds testified that contact of the antenna with the strung wire, the emergence of the attendant from the ambulance, and the shouted warning was an essentially simultaneous sequence.

On his own behalf Calderone testified that when the ambulance arrived at the scene, Reynolds stopped the vehicle, left it, and walked towards a police car parked on the side of Highway 169. There he spoke with someone. Calderone then left the ambulance and walked toward the rear of the vehicle to examine the wreck for injuries. He was unable to remember anything further. He did not remember that anyone at the scene said anything to him, nor particularly that Lt. Baker told him that a utility wire was suspended above the highway or that the officer illuminated the wire for him with his flashlight. He saw neither the wires on the ground or above him, nor realized that the ambulance antenna had struck the wire overheard.

The first point contends that the plaintiff knew of the wire and the danger it posed but that he nevertheless moved into it to his injury and so was contributorily negligent as a matter of law. Accordingly, defendant contends the denial of the motion for directed verdict was error.

■ The law requires those who generate and transmit electricity to use the highest degree of care to prevent injury which can be reasonably anticipated. *Erbes v. Union Electric Co.*, 353 S.W.2d 659, 664[1] (Mo.1962). The defendant Power Company does not contend that the plaintiff has not proved a breach of that duty to him. Indeed, the evidence for plaintiff by Swearinger, load dispatcher for the defendant, that he had it within his power by the manipulation of selector buttons to discontinue the deadly current to the live wire suspended over the highway within fifteen seconds after notice but—for reasons of his own—failed to do so, proves a jury issue on the negligent causation of a foreseeable injury. *Kidd v. Kansas City Light & Power*

*Co.*, 239 S.W. 584, 586[1, 2] (Mo.App.1922); *Tellis v. Union Electric Co.*, 536 S.W.2d 742, 745[2, 3] (Mo.App.1976). Rather, the defendant argues that the conscious movement of the plaintiff into the suspended wire after knowledge that it was charged and dangerous constitutes his contributory negligence as a matter of law.

■ In the law of electricity contributory negligence remains an issue for the jury unless reasonable men, on a view of the evidence most favorably to the plaintiff, cannot differ on the conclusion that the plaintiff failed to use ordinary care for his own safety commensurate with the danger to be avoided. *Losh v. Ozark Border Electric Cooperative*, 330 S.W.2d 847, 851[3, 5] (Mo.1960); *Tellis v. Union Electric Company, supra,* l.c. 747[6]. In the circumstances of this case, the contention of contributory negligence must be determined by whether the evidence shows conclusively to any reasonable man—that is, as a matter of law—that Calderone moved into a known danger and so assumed the risk of injury.

The Power Company fashions this argument on the evidence of the several witnesses, Baker [for the plaintiff] and Noyes and Herrin [for the defendant] that they warned Calderone of the impending danger of his continued movement in the direction of the live wire but that Calderone took no heed. Although the defendant does not differentiate the evidence on this claim of contributory negligence, the reference intends to recall the testimony of Trooper Noyes [for the defendant] that he had shouted a warning to Calderone when he was six to ten feet from the wire, the testimony of Herrin [for the defendant] that his warning—shouted simultaneously with Noyes and Baker—was given when Calderone was a step or two from the wire, and the testimony of Lt. Baker [for the plaintiff] that he had initially warned Calderone the wire might be live when the ambulance first arrived, and after contact of the antenna with the overhead wire confirmed that surmise, his warning shouted with Trooper Noyes when Calderone was two or three steps from the wire.

The plaintiff responds that the defendant may not have the benefit of all this evidence because the testimony of Baker [received as a witness for the plaintiff] in respects contradicts the testimony of Noyes and Herrin [received as witnesses for the defendant]. More specifically, the plaintiff contends the Baker testimony that he descried the path of the suspended wire for Calderone by his flashlight and warned him the wire might be live was directly contradicted by the Power Company testimony from ambulance-driver Reynolds and Herrin that Baker had no conversation at all with Calderone, and so cannot bear on the issue of contributory negligence.

■ As will appear, these contentions are all but academic. On any valid view of the evidence, the contributory negligence of the plaintiff was for the jury.

■ The law of negligence precludes a plaintiff from recovery on either of two independent grounds: that his own evidence conclusively shows contributory negligence or because the defendant has proved the issue as an affirmative defense. *Thompson v. Byers Transportation Company*, 362 Mo. 42, 239 S.W.2d 498, 499[1–4] (1951). The burden rests on the defendant to prove the affirmative defense of contributory negligence. The defendant has no burden, however, as to the plaintiff's case, and where that evidence establishes contributory negligence as a matter of law, recovery is defeated [with few exceptions], not by any intendment given defendant's evidence, but by the force of the plaintiff's case alone. *Slates v. Joplin Butane Gas Co.*, 315 S.W.2d 808, 813[1, 2] (Mo.1958); *Beaver v. Wilhelm*, 321 S.W.2d 1, 2[1] (Mo.App. 1959).

■ To meet the burden of proof on the affirmative defense of contributory negligence, the defendant may have the benefit of its own evidence or that given by the plaintiff favorable to defendant. That rule is subject to the qualification that, for that purpose, a party may not use the evidence of his adversary which contradicts his own proof and theory of the case. *Picarella v.*

*Great Atlantic & Pacific Tea Company*, 316 S.W.2d 642, 649[8–13] (Mo.App.1958); *Elkin v. St. Louis Public Service Co.*, 335 Mo. 951, 74 S.W.2d 600, 603[7–8] (1934).

The defendant Power Company—however diffuse the statement—argues that the evidence proves each separate ground of contributory negligence as a matter of law. The argument asserts that the testimony of Lt. Baker, unmodified by any other plaintiff witness, that he had warned Calderone the suspended wire posed a hazard conclusively proves the injury resulted from failure by plaintiff to observe ordinary care for his own safety. The argument further asserts that the evidence of the witnesses Herrin and Noyes [for the defendant] and Baker [for plaintiff] that Calderone moved into the wire after they had shouted warning to him conclusively proved the affirmative defense of contributory negligence. We do not find, as plaintiff suggests, that defendant has mingled impermissible inferences or contradictory evidence to support these contentions.

■ The contention that plaintiff proved himself guilty of contributory negligence as a matter of law rests altogether on this fragment of the testimony whereby Lt. Baker related, first to ambulance-driver Reynolds and then to attendant Calderone, the condition of the wires:

Q. Now, what happened at that point then?

A. [By Lt. Baker] At that time, I told him [driver Reynolds] about this line . . . . .

Q. So then what happened?

A. . . . . I told the ambulance driver about the line. I told him where to pull his ambulance. After he had told the man [Calderone] that he would see him over on the road, for him to go on over there, then that's when I explained to the attendant about the line stretched across the highway. I shined my flashlight up and down it and explained that it may be hot.

Q. Why did you use the flashlight?

A. Well, it was dark; you couldn't see without it.

If we exclude the testimony by Herrin and Reynolds for the defendant that Baker gave no such advice, as contradictory to the evidence and theory advanced by plaintiff [*Picarella v. Great Atlantic & Pacific Tea Company, supra*, l.c. 649], this narrative by Baker taken with the other circumstances of the case, does not establish that the plaintiff has proved himself out of court.

■ The law expects a person, of full capacity, to use ordinary care for his own safety to avoid a known danger. *Tellis v. Union Electric Company, supra*, l.c. 746[5]; 57 Am.Jur.2d Negligence, § 317. It does not always follow from the proof of a hazardous physical condition, however, that the plaintiff appreciated the danger to which he was exposed. It is the voluntary exposure to a hazard known and appreciated which bars recovery to a plaintiff. *Bartlett v. Taylor*, 351 Mo. 1060, 174 S.W.2d 844, 850[8–12] (1943); *Tellis v. Union Electric Company, supra*, l.c. 746[6].

The full evidence given by Lt. Baker places the extract upon which defendant relies into a more complete perspective. At the time the ambulance arrived at the scene, the intersection was in total darkness. Also, a rain continued to fall. None of the wires was visible without other illumination. The headlights of the police vehicles and of the on-lookers gathered there gave some light, but not on the scene. The suspended line formed an imperfect arc above the intersection, and from a nadir some two feet off the ground near the northwest corner [where the injured persons lay] rose sharply to the pole at the southeast corner. The suspended wire was sufficiently elevated at the southeast of the intersection to allow the ambulance [except for the antenna] to clear it. All of these facts appear in the full testimony of Lt. Baker. The excerpt of his testimony that he had advised ambulance-driver Reynolds and attendant Calderone of a safe passage under the wire and that he described the contour of the suspended line to them by flashlight, relates occurrences *immediately*

*before* the vehicle was moved east under the suspension. This testimony, aided by the non-contradictory testimony of defendant witness Reynolds—to which the plaintiff is clearly entitled on the issue of his contributory negligence [*Slates v. Joplin Butane Gas, supra,* l.c. 812[1, 2]]—that the line above could not be clearly seen even with the light upon it, raises a number of inferences favorable to the Calderone recovery. A jury could have reasonably believed that the warning given the plaintiff and his driver had to do only with the passage of the vehicle under the wire and that Baker by his flashlight described only that portion of the wire which overhung the path of the vehicle. A jury could have believed that under those conditions of climate and darkness the course of the suspended wire could not be seen definitely even by flashlight. From these facts the jury could have inferred that Calderone reasonably believed the overhang came no closer to the ground above the intersection than where the ambulance had driven through—a place of sufficient clearance to allow a man to pass under safely.

Nor does the evidence establish the affirmative defense of contributory negligence as a matter of law. For this proposition the defendant Power Company argues the shouted warning by Baker, Noyes and Herrin to Calderone who was then afoot towards the injured persons in the direction of the wire which there suspended about two feet above the ground. It was the testimony of these witnesses that they shouted in virtual unison a warning to Calderone not to move because the line was live. The testimony of these witnesses was not altogether uniform, however, as to how far Calderone was from the wire when the warning issued. Herrin for the defendant gave that distance as one or two steps; Noyes for the defendant as six to ten feet, and Baker for the plaintiff as two or three steps. Baker estimated that a few seconds elapsed between the first spoken warning to Reynolds and Calderone, the second shouted warning, and the injury. Noyes thought a few seconds passed from his shout and the injury. Herrin gave no estimate.

▰ It is evident that these proofs raise a jury issue as to whether the warnings issued in sufficient time to be heeded. The testimony of defendant witness Herrin that Calderone was one or two steps from the wire when the warning was shouted could mean to reasonable minds that it came in the very act of injury, and so too late. The rule which precludes one party from the benefit of the contradictory evidence of the other does not apply to estimates, such as of time and distance, which are not meant as positive statements of fact based on knowledge, but rather merely as opinions. *Burris v. Kansas City Public Service Co.,* 226 S.W.2d 743, 747[1–4] (Mo.App.1950). Accordingly, defendant may rely on the testimony of Baker for his contributory negligence contention to the extent that his estimates are of advantage, but they are of no significant help. The testimony of defendant witness Herrin allows the inference that the injury almost immediately followed the warning. It cannot be said on this evidence that reasonable minds would agree that Calderone voluntarily and unnecessarily assumed a position of danger with knowledge and appreciation of the risk his conduct entailed.

The precedents defendant cites to support the point are not analogous on the evidence. They are of that ilk which deny recovery because the plaintiff has exposed himself to dangerous wires, unobstructed to the view, with knowledge and appreciation of the obvious hazard. Thus, in *Tellis v. Union Electric Co.,* 536 S.W.2d 742 (Mo.App.1976) plaintiff operated a boom into an overhead live wire in broad daylight. In *Hamilton v. Laclede Electric Co-op,* 294 S.W.2d 11 (Mo. 1956) the plaintiff raised a water pump assembly into a high tension wire which was in plain view. Each was determined to be contributorily negligent as a matter of law. A case which more nearly resembles the facts we confront is *Kidd v. Kansas City Light & Power Co.,* 239 S.W. 584 (Mo. App.1922). A transmission line of the defendant Power Company in a residential area was broken by a fallen tree and

grounded. This defect was immediately and automatically registered by instrument at the office of the defendant where the operator had it within his means to instantly shut off the current on the defective circuit. Instead of resort to that procedure, the defendant sent a man to repair the break. The live wire thus lay on the street for about an hour. Some boys in the neighborhood began to play with it, and the plaintiff—unaware that it was charged—picked up the exposed end and was injured. The defendant Power and Light Company contends the plaintiff was guilty of contributory negligence as a matter of law because the other boys warned him the wire was live and not to touch it. There was evidence, however, that the warning first came as he was in the very act of snatching the wire. Thus, the question of timely warning—and contributory negligence—was for the jury. These contentions of the defendant are overruled.

The last point of defendant Power Company asserts prejudicial instruction error. The plaintiff submitted his theory of recovery by Instruction No. 4, a modification of MAI 22.02—Dangerous Condition Near Public Thoroughfare:

Your verdict must be for the plaintiff if you believe:

First, one of defendant's transmission lines was down and

Second, that said downed transmission line was uninsulated, and

Third, defendant was notified of such downed uninsulated transmission line, and

Fourth, defendant could reasonably anticipate that others may lawfully come into close proximity to such downed uninsulated transmission line, and such persons in the exercise of ordinary care were exposed to a danger of electrical shock, and

Fifth, defendant knew or should have known of such danger, and

Sixth, defendant failed to use the highest degree of care by failing within a reasonable time after notice to turn off the power to the downed uninsulated transmission line, and

Seventh, as a direct result of such failure plaintiff was injured unless you believe plaintiff is not entitled to recover by reason of Instruction No. 7.

The defendant does not suggest that the plaintiff submitted on an improper adaptation of an MAI model, but only that the formulation was incomplete. The defendant cavils because the instruction did not say how the dangerous condition of the wire could have been made safe, except to turn off the power to the transmission line. The defendant argues, in effect, that circumstances could arise where reasonable prudence would dictate a different course to protect from injury than merely to cut off the current from an endangered line—such as by barricade, sign, or other notice. The defendant argues these premises from two foreign authorities [*Osborne v. Tennessee Electric Power Co.*, 158 Tenn. 278, 12 S.W.2d 947 (1929) and *Pennebaker v. San Joaquin Light & Power Co.*, 158 Cal. 579, 112 P. 459 (bank 1910)]. The sense of these authorities is that to shut off the lights of a city is a serious matter and the damage which results may far exceed the injury the discontinuance of power was meant to prevent.

There can be no doubt that the law does not require a supplier of electricity to insure the public safety but is liable only for negligence. *Donovan v. Union Electric Company*, 454 S.W.2d 623, 626[2, 3] (Mo. App.1970). The law does require such an enterprise to exercise the highest degree of care to prevent injury reasonably foreseeable. *Erbes v. Union Electric Co.*, 353 S.W.2d 659, 663[1] (Mo.1962). And when the evidence shows—in this case—that the Power Company was made aware that its uninsulated transmission line was near the ground above a public highway, liability is made out when the jury finds that the Power Company could reasonably anticipate injury to persons nearby, but failed its duty of care. These were the propositions submitted by paragraphs first through fifth of Instruction No. 4. The defendant takes issue with paragraph sixth, which submits

the essential element of breach of duty by the finding that the Power Company failed to turn off the power to the live wire within a reasonable time after notice of the condition. The defendant finds fault because that proposition does not offer the jury an alternative, and less drastic, course of conduct whereby to acquit its duty of reasonable care—as, for instance, by a barricade of the wire.

⬛ It may be that in a given case more injury would be caused than prevented by the curtailment of electrical power, and reasonable prudence would prompt a different course. That is not this case. Here there was proof that defendant had the means within fifteen seconds after notice to cut off the flow of energy to the suspended line, but failed to do so. That was the theory of recovery submitted by Instruction No. 4. The submission followed the evidence as indeed an instruction must before a jury may find the issue, and the return of verdict was on the proof of that submission. *Brassfield v. Sears*, 421 S.W.2d 321, 323[1, 2] (Mo.1967).

The argument of the Power Company that Instruction No. 4 should have submitted also alternative courses of reasonable conduct which defendant could have taken to prevent injury after notice of the danger presented by its instrumentality undermines the fundamental doctrine of advocacy that a party has no duty of evidence on matters that do not bear on his theory of recovery. The procedures of MAI allow an adversary in a negligence case to exculpate a contention of fault against him in the verdict-director by a converse instruction. It was open to the Power Company merely to converse paragraph sixth of Instruction No. 4, which submitted that defendant failed to use the highest degree of care by failure within a reasonable time after notice to cut off the power to the suspended line. It was also open to the Power Company to submit an affirmative converse in the manner allowed by MAI 33.01 (Third Method) based upon independent evidence of the defendant that it had taken reasonable action—other than total curtailment of pow-

er—to prevent the injury. *Wilson v. Checker Cab*, 431 S.W.2d 122, 123 (Mo.1968). In fact, the Power Company attempted to justify its failure to discontinue the electric current after notice that the line was down above the intersection by the testimony of load-dispatcher Swearinger at the Ajax substation that he did not shut off the circuit which fed that line because a hospital, nursing home and other facilities in the area would be deprived of power. Had this evidence stood, it would have supported an affirmative converse of paragraph sixth of Instruction No. 4. Other evidence by the defendant was, however, that with troublemen Pettit and Cotton in radio communication with Swearinger, had the direction been given a simple procedure among them would have restored power to all the lines in the area except for the suspended wire before the occurrence of the injury, but that direction never issued. In any event, the effect of this evidence was all but nullified because the Power Company in fact did turn off the power *after* Calderone was injured. It is the sense of the argument now made by the Power Company that Calderone should have proved for the defendant what the defendant could not prove for itself—that the Power Company could have reasonably avoided injury to Calderone by a method other than the discontinuance of the electricity.

⬛ The final point contends Instruction No. 4 was erroneous because the jury was not required to find that the failure to turn off the power to the uninsulated line was negligence. If an instruction requires the jury to find propositions which, if true, establish that defendant was negligent per se, or as a matter of law, then the instruction is valid without the additional requirement that the propositions, if found, constitute negligence. In such case the law draws the conclusion, for if the jury find them no other result than negligence could be found. *Jones v. Central States Oil Co.*, 350 Mo. 91, 164 S.W.2d 914, 919[4, 5] (1942); *Haley v. Edwards*, 276 S.W.2d 153, 162[4] (Mo.1955); *Courtney v. City of Ferguson*, 401 S.W.2d 172, 174[1] (Mo.App.1966).

The facts of the case at bench, as we have noticed, are analogous to those which determined *Kidd v. Kansas City Light and Power Company, supra.* That court found the defendant Power Company, which had become aware that a transmission line was broken and grounded in a residential area but failed to make the condition safe, guilty of negligence per se. That rationale applies as well to the danger from an exposed high voltage wire suspended above a public highway as to impede the safe passage of traffic, a condition known to the Company but which the defendant did not undertake to correct. The jury return for plaintiff on the propositions of Instruction No. 4 was equivalent to a determination that defendant was negligent.

The judgment is affirmed.

All concur.