Marilyn J. GRAVES, et al., Appellants,

v.

ATCHISON–HOLT ELECTRIC
COOP., Respondent.

No. WD 48015.

Missouri Court of Appeals,
Western District.

Feb. 15, 1994.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 29, 1994.

Application for Transfer Sustained
May 26, 1994.

Case Retransferred Nov. 22, 1994.

Court of Appeals Opinion Readopted
Nov. 28, 1994.

**2**

Robert Edward Murphy, St. Joseph, for appellants.

David Phillip Madden, Overland Park, for respondent.

Before SMART, P.J., and LOWENSTEIN and FENNER, JJ.

FENNER, Judge.

In this action for wrongful death and negligence, appellants, Marilyn J. Graves, Thomas Graves, Philip Graves, and Robert Gibson, appeal the order of the Circuit Court of Platte County, Missouri, overruling appellants' motion for a new trial.

As a brief background, Donald Graves was electrocuted and Robert Gibson was serious-ly injured when a grain auger that they were handling contacted an overhead power line operated by Atchison–Holt Electric Cooperative (Atchison–Holt). Appellants, Marilyn Graves, Thomas Graves, and Philip Graves, brought suit against Atchison–Holt for wrongful death. Appellant Robert Gibson brought suit against Atchison–Holt for negligence.[1] Appellant Marilyn Graves is the widow of Donald Graves and appellants Thomas Graves and Philip Graves are his adult children.

In Count I of their first amended petition, filed on September 8, 1992, appellants alleged, in part, that Atchison–Holt was negligent in that: (1) it owned and operated a 7200 volt uninsulated, overhead electrical line in close proximity to certain grain bins located on the Kingery farm; (2) it knew or should have known that grain augers were regularly used to fill the grain bins on the Kingery farm and that persons operating said grain augers were exposed to an unreasonable risk of danger from a grain auger coming into contact with an overhead electric line; and (3) it failed to exercise the highest degree of care to remedy the condition by (a) allowing the electrical line to exist in such a location; (b) *failing to warn persons in the immediate vicinity of the electrical line about the existence and danger of the line;* (c) failing to insulate the electrical line to prevent injury; (d) failing to deactivate the electrical line; and (e) maintaining the electrical line in violation of the provisions of the National Electric Safety Code. Appellants alleged that as a result of Atchison–Holt's negligence, Donald Graves was electrocuted and Robert Gibson was seriously injured.

A jury trial took place from March 29th through April 2nd of 1993. The record reflects that the incident occurred on October 9, 1989, when Donald Graves, Robert Gibson, and Dick Kingery, who were experienced

---

1. Appellants, Philip and Thomas Graves, were added as plaintiffs during the trial of this matter. Thus, only Marilyn Graves and Robert Gibson are listed as the plaintiffs in the petition.

In their petition for wrongful death and personal injury, appellants had named both Atchison–Holt and Mayrath Industries, Inc. (Mayrath) as defendants. Mayrath was the manufacturer of the grain auger. However, appellants later reached a settlement with Mayrath in which appellants, Marilyn, Thomas and Philip Graves, received settlement monies in the sum of $35,000, and appellant Robert Gibson received settlement monies in the sum of $10,000. Thus, Atchison–Holt was the only remaining defendant.

farmers, were loading a grain bin with an auger on Kingery's farm.

On the Kingery farm, there were four grain bins that ran from east to west. The westernmost bin was the closest to the road above which the power line ran. Graves, Gibson, and Kingery were moving the grain auger from the east to the westernmost grain bin just prior to the accident. They were unhooking the auger from the tractor at the westernmost bin when the auger struck the power line. Donald Graves and Dick Kingery were electrocuted, and Gibson was seriously injured.

On April 2, 1993, the jury returned its verdicts. In Verdict A, on the wrongful death claim, the jury found that Donald Graves was 77.5% at fault and that Atchison–Holt was 22.5% at fault. The total amount of appellants' damages, disregarding any fault on the part of Donald Graves, was found to be $500,000. In Verdict B, on the personal injury claim, the jury found that Robert Gibson was 85% at fault and that Atchison–Holt was 15% at fault. The total amount of appellants' damages, disregarding any fault on the part of Gibson, was found to be $59,000.

On April 19, 1993, appellants filed a Motion for New Trial, arguing, in part, that it was prejudicial error for the trial court to admit into evidence a public opinion survey that attempted to demonstrate the common knowledge of local farmers as to hazards associated with operating farm equipment around overhead electric lines. On June 9, 1993, the trial court overruled appellants' motion.

Judgment was entered on May 21, 1993. In accordance with the jury's verdicts, the trial court ordered that appellants, Marilyn, Thomas and Philip Graves, shall recover $77,500.00 in actual damages from Atchison–Holt on their claim for the wrongful death of Donald Graves. The trial court further ordered that Robert Gibson shall recover no money in actual damages from Atchison–Holt on his claim for personal injuries.[2] This appeal followed.

The sole issue on appeal is whether the trial court erred in admitting into evidence the public opinion survey, conducted at the request of Atchison–Holt. Appellants argue that the trial court erred in admitting such evidence, and thereafter overruling their motion for a new trial, because: (1) the survey was inadmissible to establish a standard of care and to impute knowledge to a party; (2) the survey constituted inadmissible hearsay; (3) even if the survey was admissible, this particular survey did not meet the fundamental requirements of necessity and trustworthiness; and (4) the probative value of the survey was substantially outweighed by its prejudicial effect.

We initially note that the trial court has substantial discretion in ruling on the admissibility of evidence, and its ruling will not be disturbed on appeal absent an abuse of discretion. *Danneman v. Pickett*, 819 S.W.2d 770, 772 (Mo.App.1991). Review of the trial judge's ruling with regard to the admission of evidence is limited to whether the alleged error materially affected the merits of the action. *Vasseghi v. McNutt*, 811 S.W.2d 453, 456 (Mo.App.1991). Error in admitting evidence is not grounds for reversal if it does not prejudice the complaining party or adversely affect the jury in reaching its verdict. *Id.* Evidence is prejudicial if it tends to lead the jury to decide the case on some basis other than the established propositions in the case. *Slusher v. Jack Roach Cadillac, Inc.*, 719 S.W.2d 880, 882 (Mo.App. 1986).

In *Liberty Financial Management Corp. v. Beneficial Data Processing Corp.*, 670 S.W.2d 40 (Mo.App.1984), the admissibility of scientifically designed and statistically reliable surveys was recognized. Even though such surveys constitute hearsay, properly conducted surveys have gained judicial acceptance when the trustworthiness of the responses to the survey is otherwise established. *Dummit v. Burlington Northern Railroad Co.*, 789 S.W.2d 136, 138 (Mo.App. 1990).

---

2. The settlement monies that appellants received from Mayrath Industries were credited to the appellants' judgment against Atchison–Holt, pursuant to section 537.060, RSMo 1986.

We first address appellants' standard of care argument. Appellants complain that the survey "burdened [them] with a standard of care higher than that required by law," when it asked the question, "Can you say that you are always especially careful when operating equipment around powerlines?" Appellants contend that this survey question elevated the standard of ordinary care and misled the jury. We do not find that the language of this question modified the charge to the jury.

Instruction No. 7, which was submitted to the jury, properly reflected the standard of care. This instruction stated:

> The term "negligent" or "negligence" as used in these instructions with respect to decedent Donald Graves or Plaintiff Robert Gibson means the failure to use ordinary care. The phrase "ordinary care" means that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances.

The jury is bound to follow the trial court's instructions and we presume that it will even to the extent that doing so might require the jury to ignore specific argument of counsel in conflict. *Callaway v. Lilly*, 605 S.W.2d 155, 159 (Mo.App.1980) (citations omitted).

The record here reflects that the alleged standard of care question in the survey was not objected to on that basis and, moreover, was not emphasized during the testimony of Christopher Pflaum, when the survey was admitted into evidence. Just prior to Pflaum's testimony, there was a bench conference, outside of the jury's presence, concerning the admission of the survey. The following colloquy occurred:

> MR. MADDEN [defense counsel]: Your Honor, I would propose to make an offer of proof to The Court with regard to the issue of a public opinion survey that was done in Atchison County. And the selection or group of folks who were surveyed were farmers and were members of Atchison–Holt Electric Cooperative. That survey is on the knowledge of farmers of the hazards of overhead electric lines, the use of farm equipment in the vicinity of overhead electric lines, and whether they believe if they could be seriously injured or

> killed by contacting an overhead electric line. . . .

> MR. TAYLOR [counsel for plaintiffs/appellants]: Your Honor, our objection is to the fact that it is hearsay. It does not permit the plaintiff to cross examine the individual about these items. The questions are clearly in the form of leading questions which would have not been permissible had any of the witnesses taken the stand and simply been asked to relate their knowledge of overhead power lines and augers to the jury. And we do not believe that it's relevant on any issue that has been raised in this case, and certainly plaintiffs have not injected any issue that would make it relevant. And for those reasons, we request that The Court deny this evidence. And as we previously stated in chambers, it invades the province of the jury.

> \*　\*　\*　\*　\*　\*

> Your Honor, I would also argue that even if The Court would conclude that it had perhaps some relevancy to an issue in this case, that its prejudicial value far outweighs any probative value that it might have.

> THE COURT: Obviously, there must be a foundation, but at this point, based on the case you've shown me I see no reason why or how that I can in advance of your offering the evidence say that I will not receive it.

In the above colloquy, counsel for appellants did not mention the standard of care problem in the survey.

During Pflaum's testimony, defense counsel questioned Pflaum about his qualifications and about the design of the survey. He then asked about the questions in the survey, as is shown by the following excerpt from the transcript:

> Q [defense counsel]: What questions were asked?

> A [Pflaum]: We started off by saying, "Hello, this is so and so with Spectrum Economics Research. We're not calling to sell you anything. We're calling to ask farmers about safety hazards on the farm."

We then asked, "Are you the person who usually operates the tractor, harvester, grain auger and other power equipment on the farm"?

And if "No," ask for that person for a time to call back. If "Yes," we ask some questions.

The first series of questions are: "Do any gas, oil, or product pipelines cross the property that you farm"?

"Do you know the location"?

"Are they located so that you might contact them in planting, harvesting, or other normal farm activities"?

We then asked them if contact between the farm equipment and these pipelines could cause death. If they said "No," we then asked them: "Can contact between farm equipment and these pipelines cause serious injury"?

*Then we asked them the question: "Yes or no. Can you say that you are AL-WAYS," and always is in all caps, "AL-WAYS especially careful when operating equipment around pipelines"* (emphasis added)?

We then asked them another set of questions: "Do any electrical power lines cross the property that you farm"?

Next question: "Do any electrical power lines run NEXT TO OR ALONG THE BOUNDARY," and next to and along the boundary are capitalized, "of the property that your [sic] farm"?

Next question was: "Do any electrical power lines run over roads where you move your farm equipment"?

Pflaum further testified, in relevant part, as follows:

The next thing we're kind of asking three things in this survey: One, are you aware that there's danger? Two, if you are aware and most farmers were, are you—do you behave in a fashion that indicates your awareness? *So, we asked them a question: "Are you ALWAYS especially careful,"* and always was capitalized, *"when operating equipment around power lines"* (emphasis added)?

And 96.5% of the farmers that we surveyed said "Yes, that they were always

especially careful when operating equipment around power lines." Even the ones who didn't think that death or serious injury from contact; in fact, all of those that said, "No," I think or all of them were still careful. A few of those who knew the danger were not careful, or said they weren't careful.

Of the farmers who were aware that contact can cause death or serious injury, so we said, all right, the ones who answered "Yes, if the contact can cause death or serious injury, what percent were always especially careful"? 96.3%.

It didn't seem to matter whether or not they believed it could cause death or serious injury. They were still always especially careful when operating—or, said-agreed that they were always especially careful when they operated the equipment.

After defense counsel's direct examination of Pflaum, blown-up graphs, that showed the survey results, were received into evidence.

During cross-examination, the following colloquy occurred:

Q [counsel for plaintiffs/appellants]: And the fact that the 350 people that you talked to and the results that you've put together in these various pie charts, that does not indicate, it doesn't mean that with this knowledge somebody still in the exercise of ordinary care could have an accident around a hazardous location?

A [Pflaum]: No, it says they're aware of hazards and they are careful around them; that's all it says.

\* \* \* \* \* \*

Q: Wouldn't you agree, sir, that even if you were especially careful in a given situation you still could inadvertently contact some kind of a hazard?

A: I guess. . . .

\* \* \* \* \* \*

Q: You used the term "especially careful." Didn't Mr. Madden [defense counsel] advise you that the term that would be applicable in this case would be ordinary care not especially careful?

A: That never—

Q: I'm just asking did Mr. Madden mention that to you?

A: No.

Closing arguments of counsel were not included in the record, and by appellants' failure to include them, we assume that they did not support appellants' position.

Based on the record before us, we find that the survey did not direct the jury on a standard of care contrary to the court's instruction. The survey was not argued or represented to establish a standard of care other than ordinary care and the trial court did not find that the jury was misled by the survey. Appellants' argument that the survey "burdened [them] with a standard of care higher than that required by law," is denied.

■ Next, we address appellants' argument that the survey was inadmissible hearsay. As noted above, in *Liberty Financial Management Corp. v. Beneficial Data Processing Corp.*, 670 S.W.2d 40 (Mo.App.1984), the admissibility of scientifically designed and statistically reliable surveys was recognized. Even though such surveys constitute hearsay, properly conducted surveys have gained judicial acceptance when the trustworthiness of the responses to the survey is otherwise established. *Dummit v. Burlington Northern Railroad Co.*, 789 S.W.2d 136, 138 (Mo.App.1990).

In *Liberty,* Liberty Financial Management Corporation (Liberty) was persuaded by Beneficial Data Processing Corporation (Bencom) to convert to Bencom's data processing system. *Liberty,* 670 S.W.2d at 45. An agreement was entered into whereby Liberty would subscribe to Bencom's system and Bencom would perform the conversion. *Id.* at 46. However, Bencom's planning and performance of the conversion were less than adequate, and Liberty encountered many difficulties with the Bencom system. *Id.* at 46. Liberty brought an action against Bencom for breach of contract and misrepresentation, and a jury trial resulted in a judgment in favor of Liberty. *Id.* at 44. Bencom appealed. *Id.* at 46.

As one of its points on appeal, Bencom argued that it was error for the trial court to admit into evidence the results of a survey taken of persons employed continuously by Liberty throughout the nine months before and the nine months after the conversion to the Bencom system. *Id.* at 53. The purpose of the survey was to determine whether Liberty employees spent more or less time on computer problems after the conversion. *Id.* at 53. The results of the survey showed that computer problems consumed more time after conversion than before, and reflected increased, post-conversion costs to Liberty. *Id.* at 53.

The survey in *Liberty* was presented through the testimony of Mr. Bayard Wynne, director of quantitative techniques practice for, and a principal in, the firm of Arthur Anderson & Company. *Id.* at 53. Mr. Wynne testified to extensive experience in designing and participating in market surveys, and testified in detail to how the survey was conducted. *Id.* at 53. The survey results were "tabulated and analyzed under Mr. Wynne's supervision, allowing him to arrive at the conclusion that the additional computer problems caused by conversion to the Bencom system cost Liberty $462,004. This opinion was based upon Mr. Wynne's extensive experience in the area of statistics and surveys." *Id.* at 53.

The court in *Liberty* found that "it is proper to allow into evidence surveys which meet fundamental requirements of necessity and trustworthiness *for the purpose of providing the foundation for an expert opinion such as that elicited here."* *Id.* at 54 (emphasis added). The court acknowledged that the information yielded by the survey is hearsay, but stated that "[i]t does not follow ... that such characterization automatically mandates exclusion from the consideration of the trier of fact." *Id.* at 53. The *Liberty* court found the following factors to be significant in determining that the survey was admissible: (1) the survey was relevant to the issues raised; (2) the survey was scientifically designed by a mathematician-statistician with extensive experience in poll-taking; (3) the number interviewed was representative of the whole group; (4) neither the interviewers nor the interviewees knew the purpose of the poll and had no interest in the outcome; and (5) the survey came before the jury through

the sponsorship of Mr. Wynne, a witness well qualified to express an expert opinion on the ultimate issue of Liberty's loss. *Id.* at 54–55. The court stated:

> Any expert witness represents the distillation of the total of his personal experiences, readings, studies and learning in his field of expertise; *and he may rely on such background, hearsay or not, as basis for his opinion....*

*Id.* at 55 (emphasis added).

Missouri courts have held that as long as the information which an expert witness obtains from other sources serves "only as background for his opinion and [is] not offered as independent substantive evidence ..., he should not be precluded from testifying." *Stallings v. Washington University*, 794 S.W.2d 264, 271 (Mo.App.1990) (quoting *Del–Mar Redevelopment Corp. v. Associated Garages, Inc.*, 726 S.W.2d 866, 871 (Mo.App. 1987)). This is based upon the principle that allowing an expert to rely upon published or reported data is a matter of necessity, and to rule otherwise would set impossible standards with regard to proof. *Id.* (citation omitted). However, an expert who consults and merely summarizes the content of a hearsay source without applying his own expertise is merely a hearsay witness. *State ex rel. Missouri Highway & Transportation Comm'n v. Modern Tractor & Supply Co.*, 839 S.W.2d 642, 655 (Mo.App.1992) (citing *State v. Lundstrom*, 161 Ariz. 141, 776 P.2d 1067, 1074 (1989)).

In the case at bar, the group of people surveyed were farmers and members of Atchison–Holt Electric Cooperative. The survey asked questions about the knowledge of farmers of the hazards of overhead electric lines, the use of farm equipment in the vicinity of overhead electric lines, and whether those surveyed believed they could be seriously injured or killed by contacting an overhead electric line.

The results of the survey revealed that 93.6% of those surveyed knew that contact between equipment and power lines can cause death or serious injury. As to the question about grain augers, approximately 91% knew that contact between a grain auger and a power line could cause death or serious injury. Of those surveyed, 99.4% responded that they had seen, read, or heard warnings about the danger of power line contact with farm equipment, whether on television, on the radio, in newspapers or magazines, on decals on farm equipment, or in an operator's manual that came with the farm equipment. The results of the survey indicated that the overwhelming majority of those surveyed had been aware of the dangers with respect to power lines for four or more years.

The survey was received into evidence over the objection of appellants' trial counsel, who argued that the survey was hearsay, irrelevant, and prejudicial.

 The survey was, in part, an attempt by Atchison–Holt to rebut appellants' claim that Atchison–Holt failed to warn of the existence and danger of the overhead electric line. Atchison–Holt was apparently asserting in this regard that if nearly everyone in the area knew about the hazard and the potential for death or serious bodily injury, then Graves and Gibson knew about the danger and were contributorily negligent.[3]

The survey was admitted into evidence through the testimony of Christopher Pflaum, a consulting economist and president of Spectrum Economics, Inc., with a Ph.D in finance, statistical training, and management expertise. While his testimony indicates that

---

3. Under Missouri law, a person of full capacity is expected to use ordinary care for his own safety to avoid a known danger. *Calderone v. St. Joseph Light & Power Co.*, 557 S.W.2d 658, 665 (Mo. App.1977). It does not always follow from the proof of a hazardous physical condition, however, that the plaintiff appreciated the danger to which he was exposed. *Id.* It is the voluntary exposure to a hazard known and appreciated which bars recovery to a plaintiff. *Id.* In the law of electricity, contributory negligence remains an issue for the jury unless reasonable persons, viewing the evidence most favorably to the plaintiff, cannot differ on the conclusion that the plaintiff failed to use ordinary care for his own safety commensurate with the danger to be avoided. *Id.* at 664.

As to the supplier of electricity, the supplier is required to exercise the highest degree of care to prevent injury it can reasonably anticipate. *Merrick v. Southwest Electric Coop.*, 815 S.W.2d 118, 120. (Mo.App.1991).

the survey was scientifically designed and statistically reliable, this alone is not sufficient for its admission under *Liberty*.

Under the court's holding in *Liberty*, survey results are admissible for the limited purpose of providing a foundation for expert opinion, and the survey must also be relevant to the issues in the case. In the case at bar, Pflaum's testimony consisted of a recitation of how the survey was designed and conducted, what questions were asked, and how those surveyed responded to the questions. Pflaum did not offer any expert opinion based on the survey results. He was merely testifying about the survey itself and its results, and was providing no expert opinion of his own. In other words, the survey did not serve as a background for Pflaum's expert opinion, but was being offered as independent substantive evidence to rebut appellants' failure to warn claim and ultimately to show the contributory negligence of Graves and Gibson. Thus, the survey was inadmissible.

■ In finding that the survey was inadmissible, we must next determine whether its admission by the trial court was prejudicial. In this regard, the survey had the effect of presenting inadmissible evidence from 350 farmers that went directly to the question of Atchison–Holt's failure to warn and the question of whether Graves and Gibson appreciated the hazard to which they were exposed by showing that it was extremely rare for like persons, in what the jury could have inferred were similar circumstances, not to appreciate fully the danger of working with farm equipment around power lines. Furthermore, the survey adversely impacted the issue of Graves's and Gibson's contributory fault for lack of care in working around a power line. These were all questions for the jury, and inadmissible testimony of the nature presented by the survey from not one, or even a few, but 350 individuals was prejudicial to the appellants.

The trial court erred in admitting the survey into evidence and said error was prejudicial. Accordingly, the judgment of the trial court is reversed and this cause is remanded for a new trial.

SMART, P.J., concurs.

LOWENSTEIN, J., files dissenting opinion.

LOWENSTEIN, Judge, dissenting.

I respectfully file this dissent because I do not believe the law of evidence requires the witness in this case to offer an expert opinion on a survey he prepared in order to relieve a hearsay or relevancy attack. Even if hearsay objections about survey results can only be cured by merging that data with other background data as the basis of an expert's opinion, the plaintiff's cross examination of the defendant's witness did just that.

Under *Calderone v. St. Joseph Light & Power Co.*, 557 S.W.2d 658, 665 (Mo.App. 1977), the voluntary exposure to a known risk bars a recovery to a plaintiff. Here, the survey questions were prepared by the witness, Pflaum, along with a psychologist and an engineer to show a known risk of danger operating power machinery around power lines. Within the area served by the defendant, of 1010 farmer-customers who operated power machinery on their farms where power lines crossed or ran along boundary lines, 350 were randomly interviewed. In this case where lack of notice and knowledge of the persons injured or killed were issues at trial, the survey sought farmers' awareness of the dangers of power lines, and their activities based on their awareness. Pflaum examined the answers and found approximately 99% were aware of the dangers involved in operating power equipment near and around power lines. One hundred of the interviewees were called back and it was discovered that approximately 97% had been aware of the dangers for four or more years. The survey called for yes or no answers regarding personal awareness and activities. The questions were simple and easily understood by lay persons, so the survey results did not call for an expert opinion. There was extensive cross-examination of the witness on the preparation and methods used in administering the survey.

*Liberty Financial Management Corp. v. Beneficial Data Processing Corp.*, 670 S.W.2d 40 (Mo.App.1984), relied upon by the

majority, was a suit for breach of contract and misrepresentation by a company which hired the defendant to help set up a new computer system. The plaintiff received a verdict of $1,712,276, but the appeals court reversed on several grounds: 1) because the paragraph in the contract dealing with liability was withdrawn from the jury's consideration, *Id.* at 50; and 2) because admission in evidence of the plaintiff's parent corporation was deemed irrelevant. *Id.* at 52–3. The survey involved in this case had the purpose of determining how much extra time the plaintiff's employees spent on computer problems created by the defendant. As such, many employees who worked prior to and after the defendant's program failed, were interviewed. The witness analyzed the answers to arrive at a conclusion of how much employee time loss resulted from the defendant's system. Regarding defendant's point that the survey information was hearsay, the court noted this matter would "arise on retrial," the matter was then discussed. *Id.* at 53–55. The *Liberty* court said hearsay objections did not rule out admissibility of surveys where they were scientifically designed by one with extensive experience in poll-taking. The sample was representative and neither the interviewers nor the interviewees knew, nor had any interest in the outcome. The court also noted the inability to cross-examine. Part of the hearsay rule is diluted when the element of trustworthiness of the declaration is otherwise established. *Id.* at 54. The court noted, "Given the verity that surveys are accorded in everyday life, we see no reason to exclude them from consideration ..." *Id.* at 55. The offering witness in *Liberty* testified regarding the care in drafting the questions, the methodology in taking the survey, and its reliability, "were minutely described by Wynne [the witness] and were targets of cross-examination and fair subjects for argument, and no error was committed." *Id.*; *State v. McFall*, 737 S.W.2d 748, 755 (Mo.App.1987). The facts here differ from cases where the trial court's discretion was not overturned and the survey was not admitted because all the questions could not be recalled or, whether the same questions were asked of all the respondents.

*See e.g., Dummit v. Burlington N.R.R. Co.,* 789 S.W.2d 136, 138 (Mo.App.1990).

In my opinion, *Liberty* does not stand for the proposition the offeror of the survey must express an opinion on the survey for it to be admitted into evidence. In the case at bar, the survey answers were self-explanatory, and having been properly established as being designed and conducted correctly, this made the results no less admissible just because the offeror was not asked to express an opinion on the results. The result reached here penalizes the party offering the survey, because the survey called for devising questions requiring straight-forward answers based on personal knowledge and activity—answers which required no real evaluation, the results spoke for themselves.

If the law does indeed require the survey to be part of the background for an expert to formulate an opinion, then the plaintiff did just that on cross examination:

Q [counsel for plaintiffs/appellants]: And the fact that the 350 people that you talked to and the results that you've put together in these various pie charts, that does not indicate, it doesn't mean that with this knowledge somebody still in the exercise of ordinary care could have an accident around a hazardous location?

A. [Pflaum]: No, it says they're aware of hazards and they are careful around them; that's all it says.

Q. Using your statistical expertise, how likely would it have been for three experienced farmers in Atchison–Holt County to have been operating a grain auger on a particular piece of land up in that area and they would not have had knowledge of the items that you have put into that chart?

A. I think it's the numbers there. It's about three in 10,000.

Q. What's the statistical probability of those three people being there that day and not having any knowledge about these things you've asked about?

A. Virtually zero.

The survey information covered issues in the case—knowledge as to what was an unknown risk and whether additional notice

was required. Regarding their knowledge and activity of using power equipment around hanging power lines, 350 out of 1010 farmers in the area gave straight-forward answers.

The trial judge did not commit an abuse of his discretion in admitting the survey. I would affirm the judgment.